HELEN E. COTTRELL,
Plaintiff Below, Appellant,

*vs.*

THE PAWCATUCK COMPANY (formerly the C. B. Cottrell & Sons Company), a Delaware corporation (known as the Old Company), HARRIS-SEYBOLD COMPANY, a Delaware corporation, DONALD C. COTTRELL, RIDLEY WATTS, ARTHUR M. COTTRELL, JR., CHARLES P. COTTRELL, JR., and THE COTTRELL COMPANY, a Delaware corporation (known as the New Company), Defendants Below, Appellees.

*Supreme Court on Appeal, December 21, 1956.*

*Douglas W. Troll* and *Andrew D. Christie,* Wilmington, for appellant, and *Helen E. Cottrell, pro se.*

*Henry M. Canby,* of Richards, Layton & Finger, Wilmington, for appellees Pawcatuck Co., Donald C. Cottrell, Ridley Watts, Arthur M. Cottrell and Charles P. Cottrell, Jr.

*Richard F. Corroon,* of Berl, Potter & Anderson, Wilmington, and *Paul J. Bickel,* of Squire, Sanders & Dempsey, Cleveland, for appellees Harris-Seybold Co. and Cottrell Co.

SOUTHERLAND, C. J., and WOLCOTT and BRAMHALL, JJ., sitting.

SOUTHERLAND, Chief Justice: The essential question is whether the consideration received upon a sale of corporate assets was grossly inadequate.

Plaintiff, a substantial stockholder of the defendant, The Pawcatuck Company, formerly the C. B. Cottrell & Sons Company (herein referred to as "the old company"), sued to enjoin a sale of assets on the ground that the price was grossly inadequate.

An outline of the basic facts follows. It will be supplemented by additional facts in the discussion of plaintiff's contentions.

The selling corporation is the old company, an old closely-held family enterprise, founded in 1855. It was engaged in the manufacture and sale of printing presses and accessories. It had two plants, one in Connecticut and one in Wisconsin. At the time with which we are principally concerned it was a Delaware corporation with $265,000 of preferred stock and 8,000 shares of common stock issued and outstanding. The common shareholders were all descendants of the original founder or connections of the descendants.

For some years before 1950 Charles P. Cottrell, Jr. was president and held a majority of the common stock—4,502 shares. In 1949 he retired from the presidency because of ill health, and Donald C. Cottrell was elected president. Two new directors, non-stockholders, were added to the board. In the following year Charles sold 4,002 shares to Donald at $100 a share—"the family price". Donald retained 2,002 shares and resold 2000 shares to members of his family at $100 a share. These shareholders, holding 4,002 shares, together with Charles P. Cottrell, Jr., holding 500 shares, constitute the "majority group". Of the nine directors of the corporation in 1953 they had seven. The remaining 3,498 shares were held by other members of the Cottrell family including Helen E. Cottrell, the plaintiff. These shareholders constitute the "minority group". They had two members of the board, Helen and Leone B. Birdsall, her sister.

Differences of view over corporate policy divided the two groups of stockholders. In 1949 Donald's election as president was strongly opposed by the minority, or at least by Helen, who appears to have been the articulate spokesman for her group. During the following years the minutes reflect frequent objections and criticisms voiced by Helen relating to the actions of the majority.

As early as 1947, Donald Cottrell, then in charge of the plant in Wisconsin, had explored the possibility of selling or merging the old company. He had discussed the matter with Harris-Seybold Company (one of the defendants). Nothing came of the discussions because of opposition of the minority. After he became president, Donald had approached officials of five or six companies, again with the thought of a sale or merger. Nothing came of these inquiries.

In June, 1953, he received a call from the chairman of the board of Harris-Seybold, inquiring whether he (Donald) cared to resume negotiations. Donald was interested. Negotiations followed. They culminated in a contract dated November 9, 1953, providing for the sale of corporate assets to Harris-Seybold subject to director and stockholder approval, as required by the statute. 8 *Del.C.* § 271.

The necessary approval was had. Thereafter Helen Cottrell sued in the court below to enjoin the sale as a waste of corporate assets. Injunctive relief was denied, and the sale was consummated. Thereafter the case came on for trial on the merits. The plaintiff sought rescission, or, alternatively, damages. The Chancellor sustained the action of the majority directors and stockholders, holding the consideration for the sale adequate. See 35 *Del.Ch.* 309, 116 *A.2d* 787. Plaintiff appeals.

Plaintiff attacks the validity of the sale on several grounds. These will be considered seriatim.

█ 1. *The majority directors had a peculiar and personal interest in the sale which overcomes the presumption of good faith ordinarily attaching to the actions of directors.*

At the time of the sale the seven so-called majority directors and their individual holdings of stock were as follows:

| Name | Shares held |
| --- | --- |
| Donald C. Cottrell | 2,002 |
| Charles P. Cottrell, Jr. | 500 |
| Arthur M. Cottrell, Jr. | 500 |
| Ridley Watts | 300 |
| Karl C. Stillman | None |
| H. Glover | None |
| Barclay Robinson | None |

In addition Mrs. Donald C. Cottrell held 1,000 shares, and Mrs. Watts 200.

The argument is that the Cottrell majority directors had acquired their stock at $100 a share; that the proposed sale of assets would yield them a 300% net profit after taxes; and that the prospect of this profit, and the likelihood that Donald, "the dominant majority factor", would continue to be employed at the same salary, gave them a personal and selfish interest that robs their action of the presumption of good faith.

The record clearly disproves this contention. The reasons that prompted Donald Cottrell to negotiate a sale and recommend it to his fellow directors and stockholders were these:

He believed that the day of the small family-held corporation was practically over, and that such a company must expand, or join forces with a strong company, or run the risk of being swallowed up by competition. Upon his death a serious problem of liquidating his holdings to pay estate taxes would immediately arise; and as a consequence there would arise a problem of continuity of management. Control might pass to the minority group—a result that he clearly believed would be harmful to the corporation. We gather that the other majority directors concurred in this view.

Whether his judgment upon these matters was sound is not for us to say. Certainly there was some basis for it. It is enough to say that there is nothing to suggest bad faith or an intention to deal unfairly with the minority. All of the matters mentioned were proper to be considered. And this includes the matter of the consequences of

the levy of estate taxes, which would create a similar problem for the estate of any stockholder, though a less serious one. In his case the liquidation of his stock might entail the serious consequences of a shift of control.

As for the prospect of continued employment, it is clear that there was no agreement to continue Donald Cottrell in the new company at his former salary. True, the purchaser expected and desired that for a period of time the organization should remain intact. This is natural, and is no badge of fraud. The Chancellor so held, and we agree.

Moreover, the argument has no application to two of the non-stockholder directors, Robinson and Glover. Neither had any motive other than to exercise their best judgment in the interest of the corporation.

Plaintiff cites *Allied Chemical &. Dye Corporation v. Steel & Tube Company,* 14 *Del.Ch.* 1, 120 *A.* 486, in support of her argument. In that case the Chancellor held that the prospect of a profit to the controlling stockholders did not disclose such a peculiar and personal interest as amounted to fraud, but also held that in the circumstances there presented the interested stockholders might view the question of the adequacy of price "not so much from the angle of stockholders interested primarily in securing the best possible price for assets, but from the angle of purchasers of stock interested primarily in securing a fair profit on a speculation". 14 *Del.Ch.* 24, 120 *A.* 496. In that case a syndicate had purchased the controlling common stock from the estate of the deceased owner for the express purpose of making a profit upon it, by sale or otherwise.

No such situation is here presented. Obviously, Donald Cottrell was given the opportunity to acquire the majority of stock for the purpose of ensuring control of the management of the business. It is no case of an outsider buying into a corporation to make a speculation.

We hold that the acts of the directors in this case are clothed with the presumption of good faith and honest business judgment.

2. *There was no real legal approval of the sale by the directors acting as a board; to all intents and purposes, the sale was approved and ordered by a "majority caucus".*

This contention is not based upon a claim that there was no approval at a directors' meeting regularly called and held. There was such a meeting held November 19, 1953, attended by seven directors, at which five voted for the sale and two (the "minority directors") against it. The contention is that the minority directors were given no opportunity to participate in the negotiations leading up to the signing of the contract and no sufficient information to enable them to vote on it intelligently. It is further said that Donald, "motivated by a desire to unload his stock at a fraction of its value", first agreed to a sale "at so much per share" and when that plan failed another plan was "hurriedly devised" and "hastily adopted". Hence it is said that the statute requiring directorate action for a sale of corporate assets was, in effect, disregarded.

The record disproves this contention. It shows the following:

Actual negotiations with Harris-Seybold started in September. During June Donald had talked with Helen and told her that a matter of interest had come up. She asked if it was Harris-Seybold and he said it was. He agreed to send her and her sister the most recent figures on Harris-Seybold. That he did. During the summer he tried several times unsuccessfully to arrange a meeting with them and finally met with them early in September. He told them Harris-Seybold was interested. They asked him what price could be had for the stock, and Donald said he thought between $250 and $500 a share. On October 24th Donald telephoned Helen and told her he had a draft contract presented by Harris-Seybold and wanted to arrange a meeting. A meeting was had on October 27 at the office of Helen's counsel in New York City. There were present Helen and her mother and sister, Messrs. Gallagher and Walton, their counsel, and Donald Cottrell and the corporation's counsel, Mr. Frank Chapman. The

contract was reviewed and discussed, as well as an opinion reflecting the tax aspects of the proposed sale. On October 30th there was a meeting attended by Helen, her mother, Dr. Birdsall, Mrs. Edgar Cottrell, Messrs. Gallagher and Walton, Mr. Chapman and Mr. Glover, one of the directors of the old company. The provisions of the proposed sale were discussed, and Glover gave his reasons for thinking it advisable. Helen asked for certain information, and Glover sent her what was available to him. Between October 30 and the date of the directors' meeting Chapman had three conferences and three telephone talks with representatives of the minority stockholders. His object was to keep them informed of everything that was going on.

The contention that the minority directors were kept in the dark about the matter appears to be completely unfounded. So far as concerns the conduct of the negotiations, it appears that the president and his counsel took the lead, as was natural and proper. The contention that the plan was hastily devised and hastily adopted is likewise disproved by the record. The original idea of selling the stock was abandoned because the directors believed that it was impossible to persuade the minority group to sell their shares. A plan for the sale of the assets was then worked out. It is unnecessary to review the testimony in detail. It shows that the negotiations proceeded in an orderly manner, without undue haste, and resulted in an arm's-length bargain struck between a willing seller and a willing buyer.

We are of opinion that the directorate action complied with the statutory requirements.

3. *The adequacy of the price.*

The sale was based upon the old company's balance sheet of July 30, 1953.

The old company's books showed gross assets of $8,691,451.46 and liabilities of $2,451,972.56, or a net worth of $6,239,478.90—a book value of about $780 a share. Certain assets were sold to Harris-Seybold and certain assets were retained by the old company. The book value of the assets sold was (in condensed form) as follows:

Accounts and notes receivable pre-paid items
and miscellaneous ................... $1,430,851.87
Patents .............................. 52,828.89
Inventories ......................... 3,405,630.57
Plant and Equipment ................... 1,989,282.60

$6,878,593.93

The retained assets were cash, government securities, and the cash value of life insurance. These totaled $1,812,857.53, subject to liabilities not assumed by the purchase of $1,397,975.23, or net retained assets of $414,882.30.

The purchase price was $3,553,997.33, divided as follows (again in condensed form):

Accounts and notes receivable pre-paid items
and miscellaneous ................... $1,430,851.87
Patents .............................. 1.00
Inventories and plant and equipment ...... 2,123,144.46

$3,553,997.33

This price was subject to increase or decrease, to reflect changes in the current assets and inventory of the old company. These adjustments reduced the actual amount paid to about $3,116,000, but we think that in determining the adequacy of the price, the contract figure must be adopted. The adjustment provision was "a two-way street."

Of the total purchase price, $1,057,997.33 was payable by the assumption by Harris-Seybold of liabilities of the old company in that amount, representing advance deposits against inventory in process of manufacture. The balance was payable in cash, or in Harris-Seybold stock to the extent of not exceeding $500,000. Since the sale looked to liquidation, and since the old company retained net assets of over $400,000, the total return to the stockholders was about $4,000,000. (This does not include the refund of federal income taxes—a matter later considered.)

It is plain from the above figures that the disparity between net book value and the purchase price lies in the price paid for inventories and plant and equipment—probably largely in plant and equipment. (The evidence indicates that the value of the patents was negligible.) The disparity is substantial, the price being about 40% of book value —$2,223,000 to $5,395,000 in round figures.

But this sale, although in the form of the sale of certain specified assets, was a sale of operating assets, less cash, and hence in effect a sale of a going business *without working capital*. We are to determine whether the evidence shows such a gross inadequacy of the price received for the sale of that business as to raise an inference of improper motive or reckless indifference to the interest of the minority stockholders.

It has been repeatedly held in this State that upon a sale of corporate assets of an industrial corporation, the book value is of far less importance than earning power, and that reproduction cost less depreciation and valuations for insurance purposes are of little help in determining market value of plant and equipment. See *Baron v. Pressed Metals of America,* 35 *Del.Ch.* 581, 123 *A.2d* 848, and cases cited. These principles are applicable here. There was produced in this case, as in the *Pressed Metals* case, an insurance valuation. It totalled $13,000,000 on physical properties. The plaintiff also produced an engineer's appraisal of plant and equipment of $6,094,000 on the basis of reproduction cost new less depreciation. A consideration of the evidence touching going concern value based on earnings will disclose that little weight can be attached to these appraisals in determining whether the price received was grossly inadequate.

We take up first the opinions of the directors themselves.

Donald Cottrell, the president, had been with the company twenty-four years. For the reasons heretofore set forth, he was of opinion that a sale of the old company was desirable. He was of the opinion that the value of the company was about $4,000,000, or $500 a share. (Presumably he had in mind the common stock.) In early June 1953, he discussed the matter with two of the other directors, Messrs. Glover and Robinson. Mr. Glover, a director for four years,

was senior vice president of the Hartford National Bank and Trust Company. He had had twenty-two years of experience in analyzing balance sheets and evaluating the worth of corporate enterprises. He had had a wide business experience, and was a director of several manufacturing corporations. He had a study made by one of his juniors of the net worth of the old company. This study was based on a method of capitalizing average yearly earnings for a five-year period, amounting to $326,400. Three computations were made, resulting in valuations of $2,285,000, $4,083,000, and $3,852,000. Glover thought the first figure too low because of the old company's substantial book value and asset position. The second computation gave $4,083,000. But Glover believed that because of the nature of the plant and the nature of the business the book value was overstated. Using still a third factor, and capitalizing earnings at seven times, he arrived at $3,852,000. Upon the basis of his study he concluded that if the 8,000 shares of common stock could be sold for $4,000,000, it would be an excellent sale. These figures he made available to Donald and to Barclay Robinson.

Robinson, a director for four years, had been a member of the law firm that represented the company. He was in 1953 a vice president of the Hartford National Bank and Trust Company, and was a director of two other manufacturing corporations. In a discussion with Donald Cottrell upon the matter of a possible sale, Donald mentioned a price of $500 a share, which Robinson thought might well be satisfactory to the minority.

Mr. Charles P. Cottrell, Jr. had been with the old company during most of his career, and had served as president for fourteen years. After hearing the proposed sale to Harris-Seybold explained, he was willing to sell at the price suggested.

Mr. Arthur M. Cottrell, Jr. had been with the old company twenty-two years, including nineteen years as secretary. After receiving the information about the proposed sale he consulted with a Mr. O'Brien, a lawyer, who was a connection of his and general counsel for Cities Service Company, and gave O'Brien financial data concerning the company. O'Brien advised Arthur that "it [the proposed

sale] was a good thing to do not only for the company but for the stockholders."

Ridley P. Watts, a director for two years, was executive vice president of a textile corporation. In connection with the proposed sale he got some figures relating to companies in the textile business, which he considered comparable to the graphic arts industry. He arrived at a value of $4,500,000, and thought the price offered very attractive. He thought the sale desirable, because he believed that if anything happened to Donald there was no one qualified to take over.

We have detailed at length the opinions of the directors because we think that their judgment is entitled to great weight. The attempt to impeach the motive of the stockholder directors has already been considered and has been rejected. It was obviously to their interest to get the best price obtainable. And the non-stockholder directors had no such personal interest in the sale as would impeach their judgment. Mr. Glover's analysis is particularly important, because he took into account the book value and asset position of the company.

When we turn to the testimony of the experts upon the issue of value we find that they are all apparently in agreement that some form of capitalizing earnings is the most appropriate method of evaluating the worth of the old company. But they are in marked disagreement both in computing net earnings and in selecting the basis of capitalization.

Plaintiff's principal expert was a representative of a well-known firm of engineers who was retained by the plaintiff to make an appraisal and evaluation of the old company's assets. The appraisal included a valuation based on net earnings before taxes. A chart of such earnings was submitted. It shows violent fluctuations from 1944 to 1953. Net earnings after taxes of course, reflect these fluctuations. The matter is further complicated by the fact that during the years 1951 and 1952 the earnings included profit derived from the manufacture of rocket motors for the Navy—a temporary thing.

Plaintiff's expert was of opinion that as of November 30, 1953, the immediate outlook was decidedly favorable. By a process of con-

verting a sharply zigzagging line into a smooth curve, representing net income before taxes, he forecast rising income, leveling off about 1956-1957 at $1,175,000 per annum before taxes. This "estimated future average" he adopted as a basic factor in his evaluation. The new company had a good year in 1954, and this circumstance he used to buttress his forecast—a method smacking somewhat of hindsight. Deducting probable income taxes, he arrived at probable average future net earnings after taxes of $564,000. By capitalizing earnings at 11% and also using the so-called "Hoskold method" he arrived at a figure of $6,150,000 as representing the value of the old company's earning ability exclusive of rockets. This works out to about eleven times earnings. To that figure he added the $300,000 as net earnings of the rocket business for two years. Subtracting from the total of $6,450,000 estimated working capital of $800,000, he arrived at a figure of $5,650,000 as the value of the assets sold.

Upon this analysis two comments may be made. First, it takes no account of the possible future difficulties in management that might well affect future earnings. Second, and more important, it is admittedly based, not directly upon past demonstrated earning capacity, but upon an opinion of future favorable development and increased earnings.

Defendants' expert used actual earnings in his computations. By using various earning periods and combining them with returns of 12% and 15% (8½ to 6⅔ times earnings), he arrived at values approximately of $4,200,000, $3,622,000, $3,357,000 and $2,231,000.

The analyses of the two experts show, of course, that the result achieved depends first upon the earnings figure selected and second upon the rate of capitalization. The Chancellor, assuming without deciding that the plaintiff's earnings figure of $564,000 was correct, applied a multiplier of seven or eight times earnings.

As between the valuation based on a forecast of the future and one based on actual figures, the latter method seems preferable. We fully recognize the truth of Justice Holmes' dictum cited by plaintiff's expert that "the commercial value of property consists in the expecta-

tion of income from it." [1] But estimates of future income must necessarily depend to a great extent on past performance. In this case the past violent fluctuations of net earnings suggest a more conservative approach than that adopted by plaintiff's experts.

Such an approach was obviously adopted by the directors. Mr. Glover's analysis of the value of the business, set forth above, is based upon actual earnings capitalized, combined with an allowance for book value and asset position. If his figure of $4,100,000 be accepted; and if something is added for the "rocket business" (the Chancellor added $75,000), it is manifest that the price was adequate, since from the total there must be subtracted at least $800,000, representing working capital, to arrive at the value of the assets sold.

There is, of course, room for difference of opinion whether the value so arrived at is correct. A greater valuation might be justified. But we do not think that any reasonable increase of this figure could justify a finding that the price was grossly inadequate. Plaintiff's case rests upon two premises that are questionable—a forecast of the future and (in effect) a capitalization rate of eleven times the earnings so forecast. As the Chancellor pointed out, the old company's business was of the kind described by Professor Dewing as having a value of eight to seven times normal earnings. The author refers to "the old 'family' machine tool factories" as a special example of that kind. Dewing, *Financial Policy of Corporations* (5th Ed.), Vol. I, pp. 388-389.

It is also to be noted that Harris-Seybold's earning analysis of the value of the old company adopted an even lower capitalization rate—six times earnings.

One other factor is important. If plaintiff's valuations are accepted, the majority stockholders have inflicted upon themselves a serious capital loss. Why should they do that? As the Chancellor noted, the possible additional benefits to them from the sale could not compensate them for that loss.

1. *Galveston, H. & S. A. Ry. Co. v. Texas,* 210 *U.S.* 217, 28 *S.Ct.* 638, 639, 52 *L.Ed.* 1031.

From the foregoing discussion a finding that the price was not grossly inadequate is indicated. Some subsidiary arguments of plaintiff must, however, be noticed.

Plaintiff makes some point of another computation of value made by a certified public accountant. It shows a fair value of $6,200,000 and an "average value for intangibles" of $673,000. This computation adds nothing of value to the analysis of the engineers.

Plaintiff stresses the liquidation value of $5,910,000 arrived at by the engineers. In view of the importance of earning value and because of certain other doubtful assumptions made in arriving at this figure, noticed by the Chancellor, we cannot give it much weight. Certainly, it is an insufficient basis upon which to base a finding of gross inadequacy of price.

Plaintiff bottoms an argument upon the matter of the income tax refund. Because the fixed assets were sold at a loss, the old company was entitled to a refund of 1952 federal income taxes amounting to about $1,141,000. This refund it obtained. It also was relieved of an estimated tax liability for 1953 of $830,000. Plaintiff says that the transaction was deliberately designed by buyer and seller to create a fictitious loss; that in the course of the negotiations the defendants, having determined upon a price they expected to get from the buyer, restated the value downward for the purpose of getting the tax refund. This argument is highly unreasonable. Since the tax is less than 100%, the seller could have no motive to give up a dollar to recover fifty-two cents (assuming 52% as the tax rate). We find no evidence that the tax refund was the concern of the buyer in connection with the negotiations. The president of Harris-Seybold expressly denied that the buyer was concerned with it. It figures in computations made in connection with the sale, and the directors took it into account in determining the wisdom of the sale. Why should they not do so?

Defendants insist that even if the price was grossly inadequate the overall return to the stockholder was not so, because of the tax refund. They argue that, assuming that the tax refund does not constitute a consideration moving from the purchaser, it was never-

theless a term or condition of the sale justifying the directors in selling the assets at the price fixed. The argument has some force, since the refund will substantially enhance the return to the stockholders on liquidation; but in the view we take of the case, it is unnecessary to pass upon it.

Finally, plaintiff argues that the Chancellor failed to take into account, in arriving at a valuation of the assets sold, the old company's liabilities. This argument we are unable to follow.

It is our conclusion that in fixing the price for the assets sold the directors acted within the reasonable limits of business judgment. The plaintiff has failed to show any such gross inadequacy of price as would justify an inference of reckless disregard of the rights of the minority stockholders.

There remains for consideration a contention made for the first time in this Court, that the Delaware statute authorizing the sale of substantially all the assets of a corporation by vote of the majority of the voting shares is unconstitutional if applied to the old company, because its charter antedates the statute.

This question we decline to consider. It has been many times ruled in this State that questions not fairly raised in the court below will not be considered on appeal. See, for example, *Stephenson v. Commonwealth and Southern Co.,* 19 *Del.Ch.* 447, 168 *A.* 211.

Plaintiff cites *Rickards v. State,* 6 *Terry* 573, 45 *Del.* 573, 77 *A.2d* 199, in which two exceptions to the general rule were noted. That case is of no help to the plaintiff here. It concerned a case of illegal search and seizure in a criminal case, and the constitutional question, though not raised by a direct objection to the evidence, was sufficiently brought to the attention of the trial judge.

Plaintiff's attempt to raise the constitutional question here comes too late.

The judgment of the Court of Chancery is affirmed.