SALLY MARKS, suing individually as a stockholder of Trailco Corp., on behalf of herself and all other stockholders of Trailco Corp. similarly situated and in the right of Trailco Corp.,

Plaintiff,

*vs.*

LOUIS E. WOLFSON et al.,
Defendants.

SAMUEL AMSTERDAM,
Plaintiff,

*vs.*

ROBERT C. BAKER et al.,
Defendants.

*New Castle, February 8, 1963.*

*Irving Morris,* of Cohen & Morris, and *Abraham Hoffman,* Wilmington, and *Benedict Wolf,* of Wolf, Popper, Ross, Wolf & Jones and *Leo J. Linder,* New York City, for plaintiff.

*John J. De Luca,* Wilmington and *Bruce A. Hecker,* of Manning, Hollinger & Shea, New York City, for defendants Robert E. Baker, William Denny, Elkin B. Gerbert, Robert E. Harvey, Alexander Rittmaster, Marshal G. Staub, Edward L. Teale, and Louis E. Wolfson.

*James A. Walsh,* Wilmington, for defendants Merritt-Chapman and Scott Corp., New York Shipbuilding Corp. and Trailco Corp.

*William Poole,* of Berl, Potter & Anderson, Wilmington and *Irving C. Nachbar,* New York City, for defendants David B. Charnay,

Julius Epstein and Alan J. Kraft, Trans Continental Industries, Inc. and Highway Trailer Company.

MARVEL, Vice Chancellor: Plaintiffs in the above cases, which were tried together, submitted evidence in support of their respective contentions. At the conclusion of their cases in chief, counsel for the defendants against whom relief is sought, without waiving their clients' rights to offer further evidence in the event that their motions should not be granted, moved for dismissal under *Rule* 41(b), *Del. C. Ann.* on the grounds that upon the facts and the law both plaintiffs had failed to show any right to relief. Because much of the evidence upon which plaintiffs rely was elicited from the defendants it was not all favorable to plaintiffs' cause and evidentiary matter now in the record not formally offered by plaintiffs has been marked as offered by the moving defendants. The *Rule* 41(b) motions were taken under advisement and this is the opinion of the Court on such motions.

The complaints in both cases assert derivative causes of action directed towards remedying injuries allegedly caused by the same corporate act, namely the 1957 sale of the assets of Trailco Corp. [1] to Trans Continental Industries, Inc. pursuant to the terms of *Title* 8 *Del.C.* § 271. The gravamen of the charge in each case is that the purchasing corporation, whose principal stockholder was the defendant David B. Charnay, paid grossly less than fair value for such assets. However, the theories advanced in support of the two plaintiffs' respective attacks against the sale and the corresponding claims for relief in the two cases differ to some extent.

In the *Marks* case it is claimed that New York Shipbuilding Corporation, the majority stockholder of what was then Highway Trailer Company, being a fiduciary by reason of such stock holdings, breached its duty to such corporation and its minority stockholders by voting its stock for the sale of such assets without regard to the adequacy of the price paid, such sale having allegedly been caused to be made simply in order to acquire ready cash for New York Shipbuilding's own needs. It is also claimed in such action that the individual defendants, particularly those on Highway Trailer's board,

---

1. Immediately prior to the transaction here under attack Trailco Corp. was known as Highway Trailer Company.

in giving formal approval to such transaction under New York Shipbuilding's direction, were similarly guilty of a breach of trust which caused substantial damage to Highway Trailer and the rights of its minority stockholders. Such breach having been adequately established at trial, according to the plaintiff Marks, she contends that the moving defendants must now present their defense and demonstrate, if they can, the fairness of the sale.

The Amsterdam complaint, while encompassing the basic parts of the Marks complaint, goes further than merely attacking the adequacy of the price paid for Trailco's assets. It also claims that as a result of a conspiracy or a collusive agreement between Charnay and agents of the selling corporation, principally Louis E. Wolfson, chairman of the board of the defendant Merritt-Chapman & Scott Corporation, that the buyer was improperly allowed to acquire such assets, it being charged that the terms of such conspiracy or collusive agreement provided for the secret enrichment of the individual defendants. In this connection it is pointed out that the defendant Wolfson's use of his position as chairman of the board of the parent corporation as well as his ownership of stock put him to all intents and purposes in control of the selling corporation, an almost wholly owned subsidiary of New York Shipbuilding Corporation, which in turn was a subsidiary of Merritt-Chapman & Scott. Accordingly, the contention is made that the selling price for Highway Trailer's assets was arrived at as a result of Mr. Wolfson and his agents simply offering terms suitable to Mr. Charnay.

In the Marks case on the other hand a conspiracy is not charged, it being contended that in causing New York Shipbuilding Corporation to vote for the sale of the assets of Trailco Corp. in violation of its fiduciary duty to minority stockholders, Mr. Wolfson and his associates also breached their own duty to Trailco and its minority stockholders when such corporation's assets were caused to be sold to Trans Continental Industries, Inc. at a price suitable to the buyer but clearly inadequate insofar as the best interests of the seller were concerned. It is further charged by the plaintiff Marks that the terms of the sale did not reasonably safeguard the interests of the selling corporation, and while such complaint alleges that the defendants Wolfson and Charnay and their associates worked out a

plan or scheme for the transaction in question, an actual conspiracy is not charged. In an amended complaint, the plaintiff Marks complains additionally of the further loss allegedly caused what had by then become Trailco Corp. through the transfer to New York Shipbuilding of the very interest bearing promissory notes issued as partial consideration for the questioned purchase in the course of the liquidation of Trailco. As a result of this transaction, according to Mrs. Marks, New York Shipbuilding was allegedly improperly made the beneficiary of some $400,000 of contractual interest.

The complaint in the Marks case was filed by a stockholder of Trailco Corp., and in the Amsterdam case by a stockholder of Merritt-Chapman & Scott Corporation. The relationship between the two corporations, their directors and the officers and directors of the other corporations named in the complaints will appear in the course of this opinion.

The industrial complex which serves as a background for these two actions has at its top the defendant Merritt-Chapman & Scott Corporation, a large, diversified, construction firm engaged in the building of highways, dams, bridges and other such projects. It earned gross income of over three hundred and fifty million dollars in 1957, the year of the sale under attack. Among its subsidiary corporations at the time was the defendant, New York Shipbuilding Corporation, in which Merritt-Chapman owned a majority of the stock. New York Shipbuilding in turn owned all of the preferred and 95% of the common stock of the company then known as Highway Trailer Company. The latter company, which dates back to 1917, had, during World War II and the Korean War, engaged to a substantial degree in defense work. However, as of the time of the matters complained of, it had reverted essentially to the manufacturing of civilian trailers and telephone and power line construction equipment. According to its annual report for 1957, Merritt-Chapman then had 5,792,019 shares of stock issued and outstanding held by 31,128 stockholders. At the time of the matter in controversy the defendant Louis E. Wolfson and members of his family were substantial stockholders of Merritt-Chapman, and from 1951 up to the time of the present litigation, Mr. Wolfson had served as chair-

man of the board of directors of such parent corporation. There is no doubt in my mind but that Mr. Wolfson, a patently energetic and forceful person, was at the time of the transaction under attack in effective control of the board of Merritt-Chapman insofar as the making of policy decisions similar to the one here in dispute were concerned. I am also satisfied that by the selection of such persons as Mr. Wolfson and his associates liked "to have on the board" he exercised similar control over the board of the subsidiary corporation with which we are here concerned. While the trend in the affairs of Merritt-Chapman during the period here involved tended towards a broadening of its operations, such process also involved the disposing of those companies, which, for one reason or another, did not fit into Merritt-Chapman's overall plans. In fact, in 1956, Merritt-Chapman and its subsidiary, New York Shipbuilding, disposed of six corporations. In five of such transactions gains over acquisition costs were realized, and according to Merritt-Chapman's annual report for 1956 the proceeds from such sales served " * * * effectively to increase the productivity of our other operations".

In the Amsterdam case diligent efforts were made in the course of discovery to establish that the sale of Highway Trailer was an unusual as well as improper corporate act. In such case plaintiff made diligent efforts to unearth evidence of collusive or conspiratorial dealings between the defendants Wolfson and Charnay and their agents, it being known in financial and legal circles that the public relations firm known as Allied Public Relations, Inc., of which Mr. Charnay was board chairman, had performed services for Merritt-Chapman and for New York Shipbuilding. It was also a matter of general knowledge that such firm had also worked vigorously for a stockholders' committee friendly to the interests of Mr. Wolfson at the time he had sought in vain to acquire control of Montgomery Ward. The evidence establishes that Mr. Charnay was well paid for such services except those for the Montgomery Ward proxy battle for which his organization was paid over $300,000 in claimed expenses.

The chronological steps leading up to the sale under attack are as follows. Starting in the autumn of 1954, New York Shipbuilding

Company began to make substantial purchases of what was then Highway Trailer Company stock. Through exchange and purchase approximately 97% of such corporation's stock was eventually acquired at a total outlay of $3,333,875.49. However, by early 1956 the building of ships, an industry which had been lagging, began to revive and New York Shipbuilding having been awarded substantial Navy Department contracts as well as civilian work totalling many millions of dollars, its directors in the summer of 1956 determined to dispose of its subsidiary, Highway Trailer Company, and to use the cash thereby derived for the expansion of its shipbuilding operations. Mr. Wolfson and his associates, while satisfied with Highway Trailer's annual earnings,[2] were also concerned about its ability to compete successfully in the trade, particularly with its large rival, Fruehauf Trailer Company. The figure ultimately decided on by the directors as a fair price for the sale of Highway Trailer was approximately $5,000,000, a figure which they separately arived at in somewhat different ways. However, in individually reaching approximately the same figure, the directors in addition to their subjective views as to value based on experience and association with the business, under Mr. Wolfson's lead evidently took into consideration *inter alia,* average corporate eranings[3] over recent years; the essentially volatile nature of a business, which, in order to survive, had to engage in a highly competitive civilian market; the book value of the corporation's stock; the cost of such stock, and an appraisal of the company's assets by the firm of Reynolds & Co.[4] In August 1956, letters were also sent out to a number of industrial concerns inviting bids in the $5,000,000 range. The Budd Company

---

2. These had reached a peak of $750,000 in the summer of 1956.

3. Mr. Wolfson, considering the 1951-1956 average earnings of $385,000 per annum for Highway Trailer, capitalized them by multiplying them by ten. Rounding out such capitalization to $4,000,000 he added $1,000,000 for good will and the like.

4. The director, Staub, testified by deposition that in reaching his views on valuation he also studied the supporting papers on which the Reynolds' appraisal was based. While such appraisal as submitted is brief and unsupported by testimony of those persons who made the appraisal, it is evidence that one was sought from an independent and competent appraiser and that a figure in the $5,000,000 range had been arrived at.

alone evidenced any real interest in Highway but later decided against making a firm offer. About this time, Mr. Meagher, president of Highway Trailer, complained that efforts to sell the assets or stock of the corporation were having an adverse effect on its operations, and such efforts were discontinued before a firm offer had been received either for Highway's assets or for New York Shipbuilding's majority stock interest in such corporation.

In the meantime, the defendant Charnay, whose public relations firm had performed services for Merritt-Chapman as well as for the Wolfson group in its unsuccessful fight to supplant the management of Montgomery Ward, had acquired a transportation business known as Trans Continental Industries, Inc. Wishing to diversify the business of such corporation, Mr. Charnay got in touch with the defendant [5] Rittmaster, a director not only of Merritt-Chapman but of New York Shipbuilding and of Highway Trailer, who had given financial advice not only to such firms but also to Trans Continental. A tentative price of $4,500,000 was discussed, and later Mr. Charnay in a personal letter to Mr. Wolfson of September 4, 1957 sought a thirty day option to purchase all of Highway's stock for $5,000,000, such figure to be lowered in the event that New York Shipbuilding should be unable to acquire the outstanding minority stock of Highway Trailer.

As negotiations continued between the Charnay groups and agents of Mr. Wolfson, the latter suggested a purchase of assets rather than a purchase of stock with the obvious purpose in mind of gaining a tax advantage for the majority stockholder, New York Shipbuilding, upon the proposed liquidation of the old corporation. Trans Continental in response to such proposal offered the sum of $5,175,983 for Highway's assets, the figure of $175,983 constituting an estimate of the value of the interest of minority stockholders. On the same date, namely October 1, 1957, the directors of Highway Trailer

5. While Rittmaster presented Charnay's proposition to Mr. Wolfson, he later dropped out of direct negotiations. Furthermore, there is no evidence that he stood to gain any personal advantage from the sale. After voting for the sale as a director of New York Shipbuilding he arranged for a second meeting of directors and abstained from voting.

resolved that a sale on such terms would be " * * * expedient and for the best interests * * * " of the corporation, and on November 6 the stockholders of Highway Trailer voted to change its corporate name to Trailco Corp. and approved the sale. However, all this transpired only after the Charnay group had failed to obtain amendments to the final terms of sale, which, in the opinion of Mr. Staub acting for the seller, would have weakened the seller's security. Finally, on October 21, the buyer executed the contract as originally approved by Highway Trailer's board. In brief, the terms of sale provided for a cash payment of $2,000,000 with the balance payable over a period of five years in sixteen quarterly installments of $75,000 with a seventh and final installment of $1,975,983, each note to bear 6% interest. Ample security for the seller was furnished, including the placing in escrow of the stock of a new company to be formed by the buyer. Other safeguards designed to insure efficient management of such corporation were sought and obtained.

In the light of the evidence of record in each of the cases before me I conclude that the only doubtful question before me is whether or not a legally sufficient price was paid for the assets in question. In short, plaintiffs, having failed, in my opinion, to present any credible evidence indicative of a conspiracy, a collusive agreement or an illegal scheme concocted between a buyer and a seller, or to establish that the seller was in fact dealing with its alter ego, the normal presumptions surrounding the corporate act in question prevail. In other words, it was incumbent on plaintiffs to prove that the defendants against whom relief is sought were either guilty of actual fraud or that the price fixed for the sale of Highway's assets was so clearly inadequate as constructively to carry the badge of fraud.[6]

---

6. "It is not every disparity between price and value that will be allowed to upset a proposed sale. The disparity must be sufficiently great to indicate that it arises not so much from an honest mistake in judgment concerning the value of the assets, as from either improper motives underlying the judgment of those in whom the right to judge is vested or a reckless indifference to or a deliberate disregard of the interests of a whole body of stockholders including of course, the minority. In substance this principle is deducible from the cases heretofore decided by this court." *Allaun v. Consolidated Oil Co.*, 16 *Del.Ch.* 318, 147 *A.* 257.

█ Plaintiffs here, in my opinion, have done neither, and in the *Marks* case plaintiff's reliance on well recognized principles of fiduciary duty is misconceived. Majority stockholders do, of course, have a duty towards the minority, but this does not mean that when the purchaser is not a thinly veiled alter ego of the seller, *Allaun v. Consolidated Oil Co., supra,* and where there is no showing of fraud that the normal burden imposed on one who seeks to attack the validity of a sale of corporate assets is altered merely because the majority favor a sale, *Cottrell v. Pawcatuck Company,* 35 *Del.Ch.* 309, 116 *A.2d* 787, affirmed, 36 *Del.Ch.* 169, 128 *A.2d* 225. Here, there being no credible evidence of self-dealing or of a sharing in illegal and secret profits, plaintiffs to succeed were compelled to carry the burden of seeking to establish that the price paid for the assets in question was so inadequate as to fall without the purview of the type of transaction authorized by *Title* 8, *Del.C.* § 271. This they failed to do.

Turning briefly to the issue of price, there is first of all evidence of record of a contemporaneous attempt to find a buyer willing to pay approximately $5,000,000 for the properties in question and a failure to find such a buyer. It is also clear that when the defendant Charnay made an actual bid for the property, not only the precise price to be paid but the means to be employed to secure payment were haggled over by shrewd bargainers. In this connection I must conclude that under the circumstances surrounding the transaction under attack the requirement of the Securities and Exchange Commission that a statement in a proxy statement sent to Trans Continental's stockholders in December 1957 to the effect that negotiations between Mr. Charnay and the Wolfson group were not at arm's length was a warning to Trans Continental's stockholders that Charnay, because of his work for Mr. Wolfson's interests, may have been inclined to pay too much rather than too little for Highway Trailer. In actual point of fact the evidence sustains a finding, in my opinion, that the bargaining which resulted in the sale here in issue took place between a willing buyer who was not required to buy and a willing seller under no real compulsion to sell and that such bargaining was genuine and motivated by self-interest on the

part of those on opposite sides of the bargaining table. Thus, the classic test imposed in the early Delaware cases dealing with a statutory sale of assets was met, *Allied Chemical & Dye Corp. v. Steel and Tube Co.*, 14 *Del.Ch.* 1, 120 *A.* 486, 14 *Del.Ch.* 117, 122 *A.* 142, and *Allaun v. Consolidated Oil Company, supra.*

It would unduly prolong this opinion to discuss in further detail the evidence bearing on the value of Highway's assets. Suffice it to say that all such evidence, which was, of course, submitted in the course of plaintiffs' cases, has been considered and that none of it, except that of the witness Sterling, who was called as an expert, supports plaintiffs' contentions that Highway Trailer was sold for such an excessively low price as to indicate legal fraud. Based on a reasonable capitalization of average earnings for the years immediately preceding Highway's sale it is obvious that such assets were sold for well over ten times earnings,[7] the only years in which more than $500,000 were earned being 1955 with earnings of $572,000, and 1956 when earnings were $759,000. Plaintiffs have simply chosen to ignore the decisions of Delaware on sales of corporate assets dating back to *Allied Chemical and Dye Corp. v. Steel and Tube Co., supra.*

The Law of Delaware is to the effect that stockholders do not have a right to demand that their company continue indefinitely in business, and a sale of corporate assets made pursuant to the statute will not be disturbed unless it can be shown that such a sale does not meet the tests of fairness implicit in the statute and in the decisions interpreting such statute. Here, there has clearly been a failure to present evidence sufficient to impugn the sale. To be sure, Mr. Sterling's testimony was to the effect that the actual value of Highway's assets determined from the point of view of its projected earnings based on economic trends was at least $7,250,000. However, I do not consider such testimony controlling in view of the more tangible evidence of record as to the actual value of High-

---

7. Dewing's "Financial Policy of Corporations", 1953 ed. has been relied on in Delaware cases involving valuation. Even allowing for a higher multiplier for the type of business here involved because of changed business conditions since 1953 the value here set would appear to fall well above the limits discussed by Dewing.

way's assets as of the time of sale. The fairness of a price for selling assets must be judged in the light of conditions as they exist at the time of sale disregarding subsequent events, *Alcott v. Hyman,* 40 *Del.Ch.* 449, 184 *A.2d* 90. The Supreme Court of Delaware expressed its views on valuation in *Cottrell v. Pawcatuck Company,* 36 *Del.Ch.* 169, 128 *A.2d* 225, as follows:

> "As between the valuation based on a forecast of the future and one based on actual figures, the latter method seems preferable."

Finally, any injustice found in the fact that majority stockholders of New York Shipbuilding received a tax advantage denied to minority stockholders in the consummation of the transaction under attack is a matter for legislative rather than judicial correction.

Turning to the plaintiff Marks' separate claim based on the sale of the interest bearing notes to New York Shipbuilding in the course of Trailco's liquidation, it would appear that such action taken pursuant to a resolution of Trailco's stockholders adopted on December 17, 1957 which authorized Trailco's officers to take " * * * all such action as they may deem necessary or desirable to effect the dissolution and liquidation * * * " of the corporation, was in fact a step made pursuant to a stockholder-approved plan of liquidation and is not governed by *Title* 8, *Del.C.,* § 271. However, if the disposal of the notes in question can be considered a further sale of corporate assets in a technical sense, there was also technical compliance with the statute. And the fact that as a result of the sale the stockholders of Trailco received immediate cash payments in exchange for their rights under interest bearing deferred obligations, which were subject to depletion by taxes and expenses of administration, does not establish that the terms of the sale were legally unfair to minority stockholders. Again, there has been a failure to overcome the usual presumptions by the introduction of evidence that fraud or constructive fraud lay behind a transaction allegedly injurious to the rights of minority stockholders.

In conclusion, I am unable to accept plaintiffs' contentions that the burden has now been shifted to the moving defendants and

that *Rule* 41(b) motions may not be granted because of the fact that plaintiffs have either introduced some evidence in support of their contentions or that because of New York Shipbuilding's fiduciary position as a majority stockholder of Highway Trailer, its decision to sell caused it to reap a special and unfair benefit. To apply *Rule* 41(b) as plaintiffs would have the Court do, would, in my opinion, emasculate its obvious purpose in cases of this sort. I say this because of the presumption in favor of proper directorial action, *Robinson v. Pittsburgh Oil Refining Corp*, 14 *Del.Ch.* 193, 126 *A.* 46, and the fact that even where corporate action has been allegedly taken to benefit majority stockholders the burden of proving bad faith and the like rests on the plaintiff, *Bennett v. Breuil Petroleum Corp.*, 34 *Del.Ch.* 6, 99 *A.2d* 236. In other words, plaintiffs, notwithstanding the fiduciary relationships relied upon, were required to prove their cases. This they have failed to do and the fact that they did not have the opportunity to cross-examine witnesses for the moving defendants in open court does not mean that their right fully to present their cases has been unfairly truncated, *Global Commerce Corp. v. Clark-Babbit Industries, Inc.*, (*C.A.*2) 255 *F.2d* 105. Compare *Graham v. Allis-Chalmers* (*Sup.Ct.Del.*, 188 *A.2d* 125).

On notice, orders granting the moving defendants' motions may be presented.