**Louis S. GIMBEL, III, Plaintiff,**

v.

**The SIGNAL COMPANIES, INC., et al.,
Defendants.**

Court of Chancery of Delaware,
New Castle.

Jan. 10, 1974.

Rodney M. Layton, and Charles F. Richards, Jr., of Richards, Layton & Finger, Wilmington, Denis G. McInerney, F. Arnold Daum, W. Leslie Duffy, William T. Lifland, and Allen S. Joslyn, of Cahill, Gordon & Reindel, New York City, for plaintiff.

Richard F. Corroon, Robert K. Payson, and Peter M. Sieglaff, of Potter, Anderson & Corroon, Wilmington, Alan N. Halkett, of Latham and Watkins, and Brewster L. Arms, Los Angeles, Cal., for defendant Signal Companies, Inc. and Signal Oil and Gas Co.

S. Samuel Arsht, of Morris, Nichols, Arsht & Tunnell, Wilmington, William J. Manning, and Charles D. Edelman, of Simpson, Thacher & Bartlett, New York City, for defendant Burmah Oil Inc.

QUILLEN, Chancellor:

This action was commenced on December 24, 1973 by plaintiff, a stockholder of the Signal Companies, Inc. ("Signal"). The complaint seeks, among other things, injunctive relief to prevent the consummation of the pending sale by Signal to Burmah Oil Incorporated ("Burmah") of all of the outstanding capital stock of Signal Oil and Gas Company ("Signal Oil"), a wholly-owned subsidiary of Signal. The effective sale price exceeds 480 million dollars.[1] The sale was approved at a special meeting of the Board of Directors of Signal held on December 21, 1973.

The agreement provides that the transaction will be consummated on January 15, 1974 or upon the obtaining of the necessary governmental consents, whichever occurs later, but, in no event, after February 15, 1974 unless mutually agreed. The consents evidently have been obtained. On Monday, December 24, 1973, on the occasion of the plaintiff's application for a temporary restraining order, counsel for Signal and Signal Oil reported to this Court that the parties would not consummate this transaction prior to this Court's decision on the plaintiff's application for a preliminary injunction or January 15, 1974, whichever should occur first.

In light of that representation, no temporary restraining order was entered and the matter was set down for a hearing on plaintiff's application for a preliminary injunction. Affidavits and depositions were submitted. The matter was briefed and a hearing was held on January 4, 1974. By agreement, additional affidavits were filed on January 7th and January 9th. This is the Court's decision on plaintiff's application for a preliminary injunction to prevent the sale of Signal Oil to Burmah pending trial on the merits of plaintiff's contentions. It should be noted that the only parties who have appeared thus far are the plaintiff, Signal, Signal Oil and Burmah. It should also be noted that the plaintiff is part of an investment group which has some 2,400,000 shares representing 12% of the outstanding stock of Signal.

While the amount of money involved in this litigation is enormous and the values involved hotly disputed, the issues are basically simple to isolate and the Delaware law to be applied is, for the most part, well established and not open to question. I regret that time has not permitted needed editing and that this opinion is therefore longer than desirable. In applying the law to the transaction in question, the Court believes it is first desirable to review the standards for a preliminary injunction.

An application for a preliminary injunction "is addressed to the sound discretion of the court, to be guided ac-

---

1. The purchase price consists of 420 million dollars cash to be paid by Burmah at the closing, the cancellation of approximately 60 million dollars in indebtedness of Signal to Signal Oil, and the transfer by Signal Oil to Signal of a 4¾% net profits interest in the unexplored portion of Block 211/18 in the North Sea. Compare Baron v. Pressed Metals of America, Inc., 35 Del.Ch. 581, 123 A.2d 848 (Supr.Ct.1956).

cording to the circumstances of the particular case." High on Injunctions, (4th Ed.) Vol. 1, Sec. 11; Nebeker v. Berg, 13 Del.Ch. 6, 9, 115 A. 310, 311 (Ch.1921). Furthermore, the preliminary injunction constitutes extraordinary relief generally employed "to do no more than preserve the status quo pending the decision of the cause at the final hearing on proofs taken." Williamson v. McMonagle, 9 Del.Ch. 380, 386, 83 A. 139, 140 (Ch.1912); High on Injunctions, *supra,* at Sec. 5a.

■ In exercising its discretion, the Court must ask itself two familiar questions, which have long constituted the backdrop for evaluating the merits of any plaintiff's plea for a preliminary injunction.

Stated briefly, the first question is: "Has the plaintiff satisfied the Court that there is a reasonable probability of his ultimate success on final hearing?" Chancellor Josiah O. Wolcott, in an early case involving the sale of corporate assets, discussed the movant's burden with regard to this question:

> "It is well settled that a preliminary injunction will not issue unless the complainant satisfies the court that there is at least a reasonable probability of ultimate success upon a final hearing. This rule has been announced not only in cases where the improbability of ultimate success is because of a question of law (citations omitted), but as well where it appears from an examination of evidence upon a disputed question of fact (citations omitted)."

Allied Chemical & Dye Corporation v. Steel & Tube Co., 14 Del.Ch. 117, 122, 123, 122 A. 142, 158 (Ch.1923). See also, David J. Greene & Co. v. Schenley Industries, Inc., Del.Ch., 281 A.2d 30 (1971); High on Injunctions, *supra,* at Sec. 8.

The second question can be stated as follows: "Has the plaintiff satisfied the Court that he will suffer irreparable injury if the Court fails to issue the requested preliminary injunction?"

In his treatise on injunctions, James L. High spoke of this concern of equity:

> "Substantial and positive injury must always be made to appear to the satisfaction of a court of equity before it will grant an injunction [at Sec. 9] . . . An injunction, being the 'strong arm of equity' should never be granted except in a clear case of irreparable injury, and with full conviction on the part of the court of its urgent necessity." [at Sec. 22].

See also, Bayard v. Martin, 34 Del.Ch. 184, 193, 101 A.2d 329, 334 (Supr.Ct.1953), cert. den. 347 U.S. 944, 74 S.Ct. 639, 98 L. Ed. 1092 (1954). Consolidated Fisheries Co. v. Consolidated Solubles Co., 34 Del. Ch. 24, 99 A.2d 253 (Supr.Ct.1953).

■ Moreover, this second question of irreparable injury to the plaintiff should injunctive relief be denied has a corollary which requires the Court to consider potential hardship to the defendant. In this regard, Judge Rodney once wrote:

> "In the exercise of a sound judicial discretion in the award or denial of a preliminary injunction, the court should balance the conveniences of the parties and the possible injuries to them according as they may be affected by the granting or the withholding of the injunction. Yakus v. United States, 321 U.S. 414, 440, 64 S.Ct. 660, 88 L.Ed. 834."

Aldridge v. Franco Wyoming Oil Co., 9 F.R.D. 278, 279 (D.Del.1949). See also Pauley Petroleum, Inc. v. Continental Oil Co., 43 Del.Ch. 366, 231 A.2d 450 (Ch. 1967), aff'd 43 Del.Ch. 516, 239 A.2d 629 (Supr.Ct.1968); High on Injunctions, *supra,* at Sec. 13.

And, it is the plaintiff's duty to "tip" that balance:

> "While the relative convenience and inconvenience of the parties will prompt courts to consider questions of harm in exercising the discretionary power of injunction, yet a probable case must always be made out in support of the moving side before the writ will issue."

Allied Chemical & Dye Corp. v. Steel & Tube Co., *supra,* 14 Del.Ch. at 122, 122 A. at 158. See also, Gerity v. Cable Funding, 372 F.Supp. 679 (D.Del.1973).

Justice Tunnell, in his frequently cited opinion in Bayard v. Martin, *supra,* capsulized the task this Court faces in this case:

> "In acting upon applications for preliminary injunctions, a court of equity is bound to 'balance the conveniences' of the respective parties . . . (citations omitted). The probability of ultimate success, being of obvious practical importance, is one of the elements which must always be weighed in the balance, along with the probability of any harm. to be suffered by one party or the other on account of giving the requested temporary relief, or withholding it, as the case may be."

34 Del.Ch. at 190, 101 A.2d at 333.

Citing Judge Caleb Wright's decision in American Smelting and Refining Co. v. Pennzoil United, Inc., 295 F.Supp. 149 (D. Del.1969), the plaintiff has contended that, at this stage in the proceedings, "where the likelihood of irreparable harm is [as] great as it is herein, . . . a finding of probability of success is not essential" to justify a preliminary injunction (Plaintiff's Brief at p. 20). Although, in certain cases, the "harm" element may weigh more heavily than the "probability of success" element in a court's deliberations, it would clearly be unwise equity practice to completely ignore either consideration. Judge Wright did not ignore the "probability of success" element. In fact, in the very case relied upon, Judge Wright said: "In other words, plaintiff must demonstrate a reasonable probability of success on final hearing." 295 F.Supp. at 152. This Court will not ignore it either. Rather, the Court will attempt to weigh and balance both probability of success and probability of irreparable harm in reaching its decision.

> "These two elements of probability are in fact inseparable, and since in practice they appear in blends of infinite variety, the weighing and balancing of the strength of one against the weakness of the other is often a matter of the utmost delicacy, calling for a mastery of the technical rules of law as well as a penetrating common sense in practical affairs."

Bayard v. Martin, *supra,* 34 Del.Ch. at 192, 101 A.2d at 334.

A preliminary injunction is "a form of relief which will never be granted unless earned." Lenahan v. National Computer Analysts Corp., Del.Ch., 310 A.2d 661, 664 (1973). In order for the plaintiff here to "earn" his preliminary injunction against the sale of Signal Oil to Burmah, the Court must be satisfied, on the present record, that the plaintiff has a reasonable probability of succeeding on the merits of his claim. Further, the Court must also be satisfied that a preliminary injunction is necessary to protect the plaintiff from irreparable injury and that the plaintiff's need for such protection outweighs any harm that the Court can reasonably expect to befall the defendants if the injunction were granted.

Partly because of the enormous amount of money involved in this case, it is easy to discuss the irreparable injury aspect. From the plaintiff's point of view, the imminent threat of the closing of the sale does present a situation where it may be impossible to "unscramble the eggs." Metro Goldwyn-Mayer, Inc. v. Transamerica Corp., 303 F.Supp. 1344, 1348 (S.D.N.Y., 1968). While the remedy of rescission is available [see Bowers v. Columbia General Corp., 336 F.Supp. 609 (D.Del.1971)], it is not difficult to imagine the various obstacles to such a remedy including, tax consequences, accounting practices, business reorganizations, management decisions concerning capital investments, dividends, etc. and a host of other problems which as a practical matter will make rescission very difficult indeed. Moreover, when the plaintiff claims with expert support, a potential damage in the neighborhood of $300,000,000, it is doubtful that any damage claim against the directors can reasonably be a meaningful alternative. Compare

Thomas v. Kempner, C.A. 4138, Del.Ch., unreported (March 22, 1973). In short, if the plaintiff can sustain his legal position, it seems to me that he has established he will suffer irreparable harm if the consummation of the sale is not enjoined.

On the other hand, the harm to Signal of entering an injunction is also massive. Under the contract, if the transaction is delayed by litigation, Burmah has a right to withdraw and the Court has no legal power to prevent such withdrawal.[2] The loss of Signal's legal right to enforce the contract is itself irreparable harm. Moreover, it is clear generally that Signal not only has excessive Eurodollar loans outstanding but is also facing a "cash crunch" and the transaction, if completed as scheduled, should return in 1974 in interest expense saving and earnings some $36,000,000, and substantially more than the projected short term annual earnings from Signal Oil ($9,900,000 in 1971 and $12,800,000 in 1972). Chitiea affidavit, docket number 36. Furthermore, it is common knowledge that the present world oil market is in a chaotic state and it is difficult to judge with any assurance what tomorrow might bring in the way of economic conditions and government control including tax policy. The capital needs of Signal Oil are great and the cost of pursuing some of its untapped resources is substantial and of high risk. Even when walking among giants, a sale involving $420,000,000 cash is somewhat out of the routine. In short, if a preliminary injunction enters and the sale falls through and Signal ultimately prevails on the merits, Signal would have no remedy adequate to compensate it for a transaction which involves a taxable gain of $220,000,000.

In summary on the question of irreparable harm, it appears to me that there is ir-

reparable harm to the losing side on this preliminary injunction application in the event the loser should ultimately prevail on the merits. Thus, in this case, the Court feels that the emphasis in analysis on this application for a preliminary injunction should focus on whether the plaintiff has a reasonable probability of success in this lawsuit.

Turning specifically to the pleadings in this case, the complaint contains three separate counts. In Count 1 of the complaint, plaintiff asserts that the special meeting of the Board of Directors of Signal at which the proposed sale was approved and authorized and was not properly noticed and that the proposed sale requires authorization by the majority of the outstanding stock of Signal pursuant to 8 Del.C. § 271(a).

In Count 2, plaintiff alleges that the 480 million dollar sale price is "wholly inadequate," and further alleges certain personal motives by certain directors in making the business decision.

In Count 3, the plaintiff alleges a class action on behalf of all Signal stockholders who, according to the complaint, were entitled to vote upon the proposed sale.

In the application for a preliminary injunction plaintiff has not pressed the allegations that the special meeting of the Board of Directors was not properly noticed and that the directors were improperly motivated by personal advantage. Indeed, it appears that 12 out of 14 directors attended the meeting and the other two did in fact receive the notice. Nothing in the record would justify a finding at this stage that the directors acted for any personal advantage or out of improper motive or intentional disregard of shareholder interests. Nor is it important to determine on this preliminary injunction application

---

2. The purchaser has the option not to consummate the transaction if the following condition (paragraph 8.07 of the agreement) has not been met.

"8.07 No suit or action, investigation, inquiry, or request for information by an administrative agency, governmental body or private party, and no legal or administrative proceeding shall have been instituted or theatened which questions or reasonably appears to portend subsequent questioning of the validity or legality of this Agreement or the transactions provided for herein."

whether the case can proceed as a class action or not, although the discussion herein does in part relate to that decision.

Thus, in my judgment, the factual and legal issues are basically reduced to two. First, does the sale require authorization by a majority of the outstanding stock of Signal pursuant to 8 Del.C. § 271(a)?[3] Second, was the action by Signal's Board in approving the 480 million dollar sale price reckless as to justify the entry of a preliminary injunction prohibiting the consummation of the sale?

Both of these questions require reference to the facts appearing in the record, which has been reviewed in its entirety. I might add that the record is excellent considering the time factor under which counsel were laboring and, in my judgment, except on the crucial question of evaluation, entirely satisfactory for the determination of the present application. Equally helpful were the briefs of counsel on which heavy reliance has been placed both as to the facts and the law.

I turn first to the question of 8 Del.C. § 271(a) which requires majority stockholder approval for the sale of "all or substantially all" of the assets of a Delaware corporation. A sale of less than all or substantially all assets is not covered by negative implication from the statute. Folk, The Delaware General Corporation Law, Section 271, p. 400, ftnt. 3; 8 Del.C. § 141(a).

It is important to note in the first instance that the statute does not speak of a requirement of shareholder approval simply because an independent, important branch of a corporate business is being sold. The plaintiff cites several non-Delaware cases for the proposition that shareholder approval of such a sale is required. But that is not the language of our statute. Similarly, it is not our law that shareholder approval is required upon every "major" restructuring of the corporation. Again, it is not necessary to go beyond the statute. The statute requires shareholder approval upon the sale of "all or substantially all" of the corporation's assets. That is the sole test to be applied. While it is true that test does not lend itself to a strict mathematical standard to be applied in every case, the qualitative factor can be defined to some degree notwithstanding the limited Delaware authority. But the definition must begin with and ultimately necessarily relate to our statutory language.

In interpreting the statute the plaintiff relies on Philadelphia National Bank v. B. S.F. Co., 41 Del.Ch. 509, 199 A.2d 557 (Ch.1964), rev'd on other grounds, 42 Del. Ch. 106, 204 A.2d 746 (Supr.Ct.1964). In that case, B.S.F. Company owned stock in two corporations. It sold its stock in one of the corporations, and retained the stock in the other corporation. The Court found that the stock sold was the principal asset B.S.F. Company had available for sale and that the value of the stock retained was declining. The Court rejected the defendant's contention that the stock sold represented only 47.4% of consolidated assets, and looked to the actual value of the stock sold. On this basis, the Court held that the stock constituted at least 75% of the

---

3. "Every corporation may at any meeting of its board of directors sell, lease, or exchange all or substantially all of its property and assets, including its good will and its corporate franchises, upon such terms and conditions and for such consideration, which may consist in whole or in part of money or other property, including shares of stock in, and/or other securities of, any other corporation or corporations, as its board of directors deems expedient and for the best interests of the corporation, when and as authorized by a resolution adopted by a majority of the outstanding stock of the corporation entitled to vote thereon at a meeting duly called upon at least 20 days

notice. The notice of the meeting shall state that such a resolution will be considered."

The predecessor statute was evidently originally enacted in 1916 in response to Chancellor Curtis' statement of the common law rule in Butler v. New Keystone Copper Co., 10 Del.Ch. 371, 377, 93 A. 380, 383 (Ch. 1915):

"The general rule as to commercial corporations seems to be settled that neither the directors nor the stockholders of a prosperous, going concern have the power to sell all, or substantially all, the property of the company if the holder of a single share dissent."

total assets and the sale of the stock was a sale of substantially all assets.

But two things must be noted about the *Philadelphia National Bank* case. First, even though shareholder approval was obtained under § 271, the case did not arise under § 271 but under an Indenture limiting the activities of B.S.F. for creditor financial security purposes. On appeal, Chief Justice Wolcott was careful to state the following:

> "We are of the opinion that this question is not necessarily to be answered by references to the general law concerning the sale of assets by a corporation. The question before us is the narrow one of what particular language of a contract means and is to be answered in terms of what the parties were intending to guard against or to insure."

42 Del.Ch. at 111–112, 204 A.2d at 750.

Secondly, the *Philadelphia National Bank* case dealt with the sale of the company's only substantial income producing asset.

The key language in the Court of Chancery opinion in *Philadelphia National Bank* is the suggestion that "the critical factor in determining the character of a sale of assets is generally considered not the amount of property sold but whether the sale is in fact an unusual transaction or one made in the regular course of business of the seller." (41 Del.Ch. at 515, 199 A.2d at 561). Professor Folk suggests from the opinion that "the statute would be inapplicable if the assets sale is 'one made in furtherance of express corporate objects in the ordinary and regular course of the business'" (referring to language in 41 Del.Ch. at 516, 199 A.2d at 561). Folk, *supra*, Section 271, p. 401.

But any "ordinary and regular course of the business" test in this context obviously is not intended to limit the directors to customary daily business activities. Indeed, a question concerning the statute would not arise unless the transaction was somewhat out of the ordinary. While it is true that a transaction in the ordinary course of business does not require shareholder approval, the converse is not true. Every transaction out of normal routine does not necessarily require shareholder approval. The unusual nature of the transaction must strike at the heart of the corporate existence and purpose. As it is written at 6A Fletcher, Cyclopedia Corporations (Perm.Ed. 1968 Rev.) § 2949.2, p. 648:

> "The purpose of the consent statutes is to protect the shareholders from fundamental change, or more specifically to protect the shareholder from the destruction of the means to accomplish the purposes or objects for which the corporation was incorporated and actually performs."

It is in this sense that the "unusual transaction" judgment is to be made and the statute's applicability determined. If the sale is of assets quantitatively vital to the operation of the corporation and is out of the ordinary and substantially affects the existence and purpose of the corporation, then it is beyond the power of the Board of Directors. With these guidelines, I turn to Signal and the transaction in this case.

Signal or its predecessor was incorporated in the oil business in 1922. But, beginning in 1952, Signal diversified its interests. In 1952, Signal acquired a substantial stock interest in American President lines. From 1957 to 1962 Signal was the sole owner of Laura Scudders, a nationwide snack food business. In 1964, Signal acquired Garrett Corporation which is engaged in the aircraft, aerospace, and uranium enrichment business. In 1967, Signal acquired Mack Trucks, Inc., which is engaged in the manufacture and sale of trucks and related equipment. Also in 1968, the oil and gas business was transferred to a separate division and later in 1970 to the Signal Oil subsidiary. Since 1967, Signal has made acquisition of or formed substantial companies none of which are involved or related with the oil and gas industry. See Walkup affidavit, docket number 34. As indicated previously, the oil and gas production development of Signal's business is now carried on by

Signal Oil, the sale of the stock of which is an issue in this lawsuit.

According to figures published in Signal's last annual report (1972) and the latest quarterly report (September 30, 1973) and certain other internal financial information, the following tables can be constructed.[4]

SIGNAL'S REVENUES (in millions)

| | 9 Mos. Ended September 30, 1973 | December 31, 1972 | December 31, 1971 |
|---|---|---|---|
| Truck manufacturing | $655.9 | $712.7 | $552.5 |
| Aerospace and industrial | 407.1 | 478.2 | 448.0 |
| Oil and gas | 185.8 | 267.2 | 314.1 |
| Other | 16.4 | 14.4 | 14.0 |

SIGNAL'S PRE-TAX EARNINGS (in millions)

| | 9 Mos. Ended September 30, 1973 | December 31, 1972 | December 31, 1971 |
|---|---|---|---|
| Truck manufacturing | $ 55.8 | $ 65.5 | $ 36.4 |
| Aerospace and industrial | 20.7 | 21.5 | 19.5 |
| Oil and gas | 10.1 | 12.8 | 9.9 |

SIGNAL'S ASSETS (in millions)

| | 9 Mos. Ended September 30, 1973 | December 31, 1972 | December 31, 1971 |
|---|---|---|---|
| Truck manufacturing | $581.4 | $506.5 | $450.4 |
| Aerospace and industrial | 365.2 | 351.1 | 331.5 |
| Oil and gas | 376.2 | 368.3 | 369.9 |
| Other | 113.1 | 102.0 | 121.6 |

SIGNAL'S NET WORTH (in millions)

| | 9 Mos. Ended September 30, 1973 | December 31, 1972 | December 31, 1971 |
|---|---|---|---|
| Truck manufacturing | $295.0 | $269.7 | $234.6 |
| Aerospace and industrial | 163.5 | 152.2 | 139.6 |
| Oil and gas | 280.5 | 273.2 | 254.4 |
| Other | (55.7) | (42.1) | (2.0) |

Based on the company's figures, Signal Oil represents only about 26% of the total assets of Signal. While Signal Oil represents 41% of Signal's total net worth, it produces only about 15% of Signal's revenues and earnings. Moreover, the additional tables shown in Signal's brief from the Chitiea affidavit are also interesting in demonstrating the low rate of return which has been realized recently from the oil and gas operation.

PRE-TAX DOLLAR RETURN ON VALUE OF ASSETS

| | 9 Mos. Ended September 30, 1973 | 1972 | 1971 |
|---|---|---|---|
| Truck manufacturing | 12.8% | 12.9% | 8.1% |
| Aerospace and industrial | 7.5 | 6.1 | 5.9 |
| Oil and gas | 3.6 | 3.5 | 2.7 |

PRE-TAX DOLLAR RETURN ON NET WORTH

| | 9 Mos. Ended September 30, 1973 | 1972 | 1971 |
|---|---|---|---|
| Truck manufacturing | 25.1% | 24.2% | 15.5% |
| Aerospace and industrial | 16.8 | 14.1 | 14.0 |
| Oil and gas | 4.8 | 4.7 | 3.9 |

While it is true, based on the experience of the Signal-Burmah transaction and the record in this lawsuit, that Signal Oil is more valuable than shown by the company's books, even if, as plaintiff suggests in his brief, the $761,000,000 value attached to Signal Oil's properties by the plaintiff's expert Paul V. Keyser, Jr., were substituted as the asset figure,[5] the oil and gas properties would still constitute less than half the value of Signal's total assets. Thus, from a straight quantative approach, I agree with Signal's position that the sale to Burmah does not constitute a sale of "all or substantially all" of Signal's assets.

In addition, if the character of the transaction is examined, the plaintiff's position is also weak. While it is true that Signal's original purpose was oil and gas and while oil and gas is still listed first in the certificate of incorporation, the simple fact is

4. The tables that follow are contained in the Chitiea affidavit, docket number 36.

5. In my judgment, it is necessary to include the 25% discount factor which Mr. Keyser states "it seems prudent to apply." Keyser affidavit, docket number 15.

that Signal is now a conglomerate engaged in the aircraft and aerospace business, the manufacture and sale of trucks and related equipment, and other businesses besides oil and gas. The very nature of its business, as it now in fact exists, contemplates the acquisition and disposal of independent branches of its corporate business. Indeed, given the operations since 1952, it can be said that such acquisitions and dispositions have become part of the ordinary course of business. The facts that the oil and gas business was historically first and that authorization for such operations are listed first in the certificate do not prohibit disposal of such interest. As Director Harold M. Williams testified, business history is not "compelling" and "many companies go down the drain because they try to be historic." Williams' deposition, docket number 301 p. 28.

It is perhaps true, as plaintiff has argued, that the advent of multi-business corporations has in one sense emasculated § 271 since one business may be sold without shareholder approval when other substantial businesses are retained. But it is one thing for a corporation to evolve over a period of years into a multi-business corporation, the operations of which include the purchase and sale of whole businesses, and another for a single business corporation by a one transaction revolution to sell the entire means of operating its business in exchange for money or a separate business. In the former situation, the processes of corporate democracy customarily have had the opportunity to restrain or otherwise control over a period of years. Thus, there is a chance for some shareholder participation. The Signal development illustrates the difference. For example, when Signal, itself formerly called Signal Oil and Gas Company, changed its name in 1968, it was for the announced "need for a new name appropriate to the broadly diversified activities of Signal's multi-industry complex." Walkup affidavit, docket number 34.

The situation is also dramatically illustrated financially in this very case. Independent of the contract with Burmah, the affidavit of Signal's Board Chairman shows that over $200,000,000 of Signal Oil's refining and marketing assets have been sold in the past five years. Walkup affidavit, docket number 34. This activity, prior to the sale at issue here, in itself constitutes a major restructuring of the corporate structure.

▪ I conclude that measured quantatively and qualitatively, the sale of the stock of Signal Oil by Signal to Burmah does not constitute a sale of "all or substantially all" of Signal's assets. This conclusion is supported by the closest case involving Delaware law which was been cited to the Court. Wingate v. Bercut, 146 F.2d 725 (9th Cir. 1944). Accordingly, insofar as the complaint rests on 8 Del.C. § 271(a), in my judgment, it has no reasonable probability of ultimate success.

I turn now to the second and more difficult question presented on this application for a preliminary injunction.

The plaintiff attacks the proposed transaction on the grounds that the 480 million dollar sale price is wholly inadequate compensation for the assets of Signal Oil.

▪ In evaluating the merits of this allegation, precedent requires the Court to start from the normal presumption that Signal's Board of Directors acted in good faith in approving the sale of Signal Oil to Burmah. Chancellor Josiah Wolcott spoke thusly of this good faith presumption:

" . . . [T]he directors of the defendant [selling] corporation are clothed with that presumption which the law accords to them of being actuated in their conduct by a *bona fide* regard for the interests of the corporation whose affairs the stockholders have committed to their charge. This being so, the sale in question must be examined with the presumption in its favor that the directors who

negotiated it honestly believed that they were securing terms and conditions which were expedient and for the corporation's best interests."

Robinson v. Pittsburgh Oil Ref. Corp., 14 Del.Ch. 193, 199, 126 A. 46, 48 (Ch.1924). See also Butler v. New Keystone Copper Co., 10 Del.Ch. 371, 376, 93 A. 380, 382 (Ch.1915).

This presumption, an important aspect of what has generally come to be known as the "business judgment rule," has been consistently reaffirmed and broadened with respect to the sale of corporate assets over the past several decades. See also Allaun v. Consolidated Oil Co., 16 Del.Ch. 318, 325, 147 A. 257, 261 (Ch.1929); Mitchell v. Highland-Western Glass Co., 19 Del.Ch. 326, 330, 167 A. 831, 833 (Ch.1933); Gropper v. North Central Texas Oil Co., 35 Del.Ch. 198, 202, 208, 114 A.2d 231, 233, 237 (Ch.1955); Cottrell v. Pawcatuck Co., 35 Del.Ch. 309, 311, 116 A.2d 787, 788 (Ch.1955) aff'd 36 Del.Ch. 169, 172–175, 128 A.2d 225, 228 (Sup.Ct.1956); and see generally, Folk, *supra*, §§ 144, 271 (1972). Application of the rule, of necessity, depends upon a showing that informed directors did, in fact, make a business judgment authorizing the transaction under review. Kaplan v. Centex Corporation, Del.Ch., 284 A.2d 119, 124 (1971); Mitchell v. Highland-Western Glass Co., *supra*, 19 Del.Ch. at 329, 167 A. at 833 (Ch.1933).

Although not dealing specifically with the sale of a substantial corporate asset, Chief Justice Daniel F. Wolcott recently recognized the strength of the presumption inherent in this rule:

"A board of directors enjoys a presumption of sound business judgment, and its decisions will not be disturbed if they can be attributed to any rational business purpose. A court under such circumstances will not substitute its own notions of what is or is not sound business judgment."

Sinclair Oil Corporation v. Levien, Del. Supr., 280 A.2d 717, 720 (1971). Quite recently, Vice Chancellor Brown also applied the business judgment rule when called upon to enjoin a large scale corporate merger. Muschel v. Western Union Corporation, Del.Ch., 310 A.2d 904, 908 (1973).

This does not mean, however, that the business judgment rule irrevocably shields the decisions of corporate directors from challenge. As Vice Chancellor Marvel explained in Marks v. Wolfson, the business judgment rule weighs in favor of the directors' decision to sell assets unless the complaining shareholders can prove fraud or a clearly inadequate sale price:

"In other words, it [is] incumbent on plaintiffs to prove that the defendants against whom relief is sought were either guilty of actual fraud or that the price fixed for the sale of Highway's assets was so clearly inadequate as constructively to carry the badge of fraud."

41 Del.Ch. 115, 123, 188 A.2d 680, 685 (Ch.1963). See also Alcott v. Hyman, 40 Del.Ch. 449, 184 A.2d 90 (Ch.1962); aff'd 42 Del.Ch. 233, 208 A.2d 501 (Supr.Ct. 1965).

In challenging the sale of Signal Oil to Burmah, the plaintiff here does not seriously charge that the proposed transaction constitutes fraudulent self-dealing on the part of Signal's Board of Directors. Indeed, only one member of the Board, Willis H. Thompson, Jr., is expected to have any relationship with Burmah after the sale. Thompson is President and Chief Executive Officer of Signal Oil. He plans to continue in that position if Signal Oil is sold to Burmah. Other than that, the only benefit any members of the Board would receive from the sale is that which would accrue to any ordinary shareholder according to his holdings in Signal. It is usually assumed that such individual benefit also works for the benefit of the corporation.

Cottrell v. Pawcatuck Co., *supra,* 36 Del. Ch. at 182, 128 A.2d at 232. At this stage, the Court can find no indication of self-dealing on the part of the Board of Directors such as would taint the proposed transaction or neutralize the effect of the business judgment rule. And, therefore, plaintiff's argument at pages 33 and 34 of his brief, that the usual presumption of director good faith ought not apply, must fail. Plaintiff relies mistakenly on cases wherein questionable corporate transactions involving blatant self-dealing. Such is not the case here where arm's length bargaining marked the transaction and the vote of interested directors was not necessary to approve the transaction. Folk, *supra,* Section 271, pp. 405–406.

■ Actual fraud, whether resulting from self-dealing or otherwise, is not necessary to challenge a sale of assets. And, although the language of "constructive fraud" or "badge of fraud" has frequently and almost traditionally been used, such language is not very helpful when fraud admittedly has not been established. There are limits on the business judgment rule which fall short of intentional or inferred fraudulent misconduct and which are based simply on gross inadequacy of price. This is clear even if language of fraud is used. The principles are familiar and should start with the directors' discretion and the limits thereof when dealing with price under the business judgment rule:

> "When the question is asked whether in a given case the price is adequate, it is readily seen that room is afforded for honest differences of opinion. While the parties to the controversy may be guilty of an intolerance of view towards each other, yet a court, when called upon to decide the question, must endeavor, as best it may, to arrive at the correct answer, making all due allowance for the range over which honestly inclined minds may wander. It is further true that inadequacy of price will not suffice to condemn the transaction as fraudulent, unless the inadequacy is so gross as

to display itself as a badge of fraud. I take it that so long as the inadequacy of price may reasonably be referred to an honest exercise of sound judgment, it cannot be denominated as fraudulent. When the price proposed to be accepted is so far below what is found to be a fair one that it can be explained only on the theory of fraud, or a reckless indifference to the rights of others interested, it would seem that it should not be allowed to stand."

Allied Chemical & Dye Corporation v. Steel & Tube Co., 14 Del.Ch. 1, 19, 120 A. 486, 494 (Ch.1923).

> "[F]airness or unfairness of the price . . . must be judged in the light of the conditions as they existed at the time of the execution of the contract."

Allied Chemical & Dye Corp. v. Steel & Tube Co., *supra,* 14 Del.Ch. 64, at 95, 122 A. 142, at 155.

> "It is not every disparity between price and value that will be allowed to upset a proposed sale. The disparity must be sufficiently great to indicate that it arises not so much from an honest mistake in judgment concerning the value of the assets, as from either improper motives underlying the judgment of those in whom the right to judge is vested or a reckless indifference to or a deliberate disregard of the interests of the whole body of stockholders including of course the minority."

Allaun v. Consolidated Oil Co., *supra,* 16 Del.Ch. at 325, 147 A. at 261 (Ch.1929). See also Cole v. National Cash Credit Ass'n, 18 Del.Ch. 47, 58, 156 A. 183, 188 (Ch.1931); Baron v. Pressed Metals of America, Inc., 35 Del.Ch. 325, 332, 117 A. 2d 357, 361 (Ch.1955), aff'd 35 Del.Ch. 581, 123 A.2d 848 (Supr.Ct.1956).

One recognized test on the directors' business judgment is the free marketplace. In Marks v. Wolfson, *supra,* Vice Chancellor Marvel employed "the classic test imposed in the early Delaware cases" in

reaching his conclusion that the sale price established for corporate assets satisfied the law:

"In actual point of fact the evidence sustains a finding, in my opinion, that the bargaining which resulted in the sale here in issue took place between a willing buyer who was not required to buy and a willing seller under no real compulsion to sell and that such bargaining was genuine and motivated by self-interest on the part of those on opposite sides of the bargaining table."

41 Del.Ch. at 124, 125, 188 A.2d at 686 (Ch.1963).

More recently, Vice Chancellor Short dealt with the problem of conflicting testimony on the valuation of assets in applying the business judgment rule to uphold a corporate decision to exchange a sizeable amount of stock for certain assets:

"The expert testimony and legal analysis on these [valuation] issues are in hopeless conflict. But since I am satisfied that in any event the methods of valuation used were not so clearly wrong as to result in an unconscionable advantage secured to the [transferors of the assets to the corporation] resolution of these issues is not required.

"I conclude that since the transaction complained of was accomplished as a result of the exercise of independent business judgment of the outside, independent directors whose sole interest was the furtherance of the corporate enterprise, the court is precluded from substituting its uninformed opinion for that of the experienced, independent board members."

Puma v. Marriott, Del.Ch., 283 A.2d 693, 695, 696 (1971); Muschel v. Western Union Corporation, *supra*.

Keeping in mind this guidance and other similar precedent on valuation and director responsibility to obtain a fair price for corporate assets, the Court will now consider those allegations whereby the plaintiff seeks to hurdle the protections of the business judgment rule and successfully challenge the sale of Signal Oil. The question is: did the Signal directors act recklessly in accepting a wholly inadequate price for Signal Oil?

Factually, to support his claim of recklessness, the plaintiff basically relies on three related factors: the alleged gross inadequacy of price; the failure of the Board of Directors to act on such an important matter with informed reasonable deliberation; and specifically the failure of the Board of Directors to obtain an updated appraisal of Signal Oil's properties before agreeing to accept Burmah's offer. Except for the key question of value, there is not significant dispute over the factual chronology.

Prior to Burmah's first contact relating to this agreement, which was on October 17, 1973,[6] Signal had been negotiating a proposed merger with United Aircraft. The deal fell through in September 1973. In connection with that transaction, a report was drafted by DeGolyer and MacNaughton, a prominent independent firm of petroleum geologists. The report valued Signal Oil's reserves as of June 30, 1973 at an approximate figure between 230 and 260 million dollars. DeGolyer and MacNaughton Appraisal Report, docket number 45; Shumway deposition, docket number 29, p. 37. There were other accounting reports prepared by Price Waterhouse and Company in connection with the proposed merger. In addition, Signal requested Kenneth E. Hill, an expert in the evaluation of oil properties, to undertake an evaluation of the petroleum properties of Signal Oil. Mr. Hill had done so and, as of September 13, 1973, his opinion of the fair market value of the oil properties was $350,000,000. Hill affidavit, docket number 48.

6. Burmah had previously expressed an earlier interest in Signal Oil in 1968.

On October 17, 1973, in Houston, Texas, Max Roberts and Clifford Andrews, representatives of Burmah, approached Willis H. Thompson, President and Chief Executive Officer of Signal Oil, about the possibility of Burmah acquiring some or all of Signal Oil's properties. Thompson referred them to Forrest N. Shumway, the President and Chief Executive Officer of Signal and on October 24, 1973, there was a meeting in Los Angeles. At that time, N. J. D. Williams, Chief Executive Officer of Burmah Oil Co. Ltd., the British parent of Burmah, indicated that Burmah was interested in acquiring the assets of Signal Oil in a range of $400,000,000. Shumway said that any offer in excess of $400,000,000 would be submitted to the Board of Directors.

There followed an exchange of information including the DeGolyer and MacNaughton report and the accounting reports of Price Waterhouse. Negotiations continued through November, including extensive drafting sessions with Burmah's attorneys. The matter was not put before Signal's Board of Directors at the November 27, 1973 meeting although the Board was advised generally that management had other inquiries about subsidiaries since the United transaction fell through. A Burmah representative was invited to address a meeting of the Signal Oil Board, at which was discussed Burmah's history, business and operating policies. By early December, a third draft of the purchase agreement had been prepared, access to confidential data had been permitted and Burmah had sent Signal a draft of a press release to announce the transaction. All this occurred during a period when there was no notification to the Board of Directors in their capacity as Board members of the developments. An attorney for the minority, on the basis of rumors, wrote a letter dated December 3, 1973 indicating opposition to a sale of oil and gas properties, indicating further that shareholder approval was required, and requesting consultation. See Exhibit 10 of docket number 21.

Burmah's formal offer was communicated to Signal on December 18, 1973. The offer required acceptance on or before December 21, 1973. A special meeting of the Board of Directors of Signal was called for December 21. This meeting was called on notice of only a day and a half and the outside directors were not notified of the purpose of the meeting. At least three of the outside directors were confronted with the proposed sale for the first time at the special meeting itself. Plaintiff learned of the proposed sale when it was reported in the press on Saturday, December 22, 1973.

At the meeting, a handwritten outline of the transaction was submitted to the directors and an oral presentation was made in support of the transaction. There was no updated evaluation of the oil and gas reserves of Signal Oil presented. There was no effort made at that time to determine if other companies would offer a higher price. The meeting lasted a couple of hours and resulted in the approval of a transaction of over $480,000,000 and possibly one of the largest private cash sales ever to take place.

It is important to note what was discussed at the special Board of Director's meeting on December 21. In addition to the depositions, the handwritten memorandum and handwritten minutes outlining the presentation were useful in determining the discussion. Exhibits 5 and 6 of docket number 21. It is also important to note that the discussion took place with the background of aborted United negotiations and other inquiries. It appears that there was some review of the per share value of Signal stock and it was determined that, as of the market closing on December 20, the total market value of Signal stock was estimated at 440 million dollars. The terms of the contract were reviewed with an overall analysis of the tax consequences. There was discussion of the use of the proceeds to be gained from the sale of Signal Oil and, in particular, the advantage of pre-paying certain indebtedness, the advan-

tage from increased interest income, and the needs of the other subsidiaries, which were giving a greater return. There was discussion of sales, income, cash flow, the balance sheet and the general financial status of the corporation. The current situation in the oil industry was discussed including the impact on price and profit and the potential for additional oil finds. Oil reserve values received substantial discussion. Price increases were contemplated. The risk of price controls and the limitations that could come from allocations and excess profit taxes were reviewed. Capital expenditure requirements of Signal Oil were reviewed and, particuarly, the risk factor in the North Sea investment. The advantage of the Signal Oil investment was compared with the advantage of having the cash on hand. The advisability of waiting for a higher price was discussed. The Burmah offer was the best suggested price of any discussions with potential buyers and Burmah could pay it. In summary, while the meeting was short for a transaction of this size, there was an overall view of the situation,[7] generally within the confines of the material the company already had available.

The plaintiff makes a point "of the lack of knowledge on the part of the directors as to the oil industry in general and the sale of Signal in particular." Plaintiff's Memorandum p. 4. In the first regard, the plaintiff simply unfairly overstates his case. The Board of Signal includes the following twelve people who were present at the December 21st meeting. Four members of the Board (William E. Walkup, Chairman of the Board, Forrest N. Shumway, President, Andrew J. Chitiea, Sr., Vice President-Financial Administration, and Brewster L. Arms, House Counsel)

are directly involved in the management of Signal and each had extensive experience. A fifth, Willis H. Thompson, Jr., is President of Signal Oil and a geologist. Two others, Harry H. Wetzel and Donald C. McHone, are management people in subsidiary corporations. Clinton R. Stevenson is partner of Signal's principal outside legal counsel.

Information in the record on the four outside directors includes the following information. James E. Patrick, Jr. is a retired banker with some banking experience in the oil industry. Howard M. Williams is Dean of the Graduate School of Management at UCLA and a Harvard Law graduate with extensive tax background. Robert O. Reynolds is a businessman whose experience includes 25 years as an individual oil investor. Arch Manson, Jr. is President of a theatrical and TV lighting and staging corporation and also President of a corporation dealing in fire protection material.

Suffice it to say that the Board of Signal is a sophisticated one and one which by experience and background would compare favorably to Boards of Directors of similar corporations.

Moreover, it is apparent that the Board was aware that Signal had cash needs and was naturally reluctant to do anything that might upset a sale which would bring to the Board $420,000,000 cash and which was for a total consideration that exceeded by approximately $75,000,000 the market value of the total number of Signal shares currently outstanding.[8] They were understandably fearful of challenging the time factor imposed by Burmah's offer of December 18th.

---

7. Shumway sums up the Signal case pointedly: "Now, here is a situation where we have sold 25 percent of our assets and 25 percent or less of last year's earning power, maybe 30 percent this year, and we've got 110 percent of our market price and we are being sued for stupidity. That's just hard to believe." Shumway deposition, docket number 29, p. 49.

8. See paragraph 14 of complaint. Director Williams testified appropriately: "It was cash. Those are the best terms I can think of." Williams deposition, docket number 30, p. 22.

But having given full weight to the legitimate considerations of the Board, it is necessary, at the risk of repetition, to pinpoint elements which suggest imprudence. The circumstances are such as to raise the question as to whether the Signal Board, when the sale of Signal Oil stock was presented, were able to perform their fiduciary obligation as directors to make an informed judgment of approving the transaction. In particular, it is difficult to ignore the following facts.

The transaction had been in progress since October. I am satisfied that management decided early in the game, and probably in October, that the offer, when made, would be recommended to the Board. Certainly by early December the only reasonable assumption was that management would recommend the transaction to the Board.

To highlight the fact that management did not bring the proposed transaction to the attention of the Signal Board, it should be noted that in early December management did bring the transaction to the attention of the Signal Oil Board, evidently because personnel at Signal Oil were somewhat restless about the investigation being conducted by the Burmah people. But the point is management was ready to go out of its way of relieving anxiety in the subsidiary that was being transferred and yet made no advance effort to educate the directors whose responsibility it was to approve the transaction. The point is aggravated by the fact that there was a regular board meeting with one hundred per cent attendance on November 27, 1973. Walkup affidavit, docket number 34.[9]

Even granting that management had prior legal difficulties with the minority group of which the plaintiff is a member, it is hard to overlook the fact the minority interest wrote to each board member, expressed opposition to the sale of the oil and gas interest, further stated its belief that any such transaction required shareholders' approval and further requested to be consulted. Except for obtaining an opinion of counsel to counter the legal position on the requirement of shareholder action, this request was totally ignored by management and by the Board. Such lack of consideration for a minority viewpoint of the substantial block of stock, and perhaps the largest single block of stock, gives rise to the allegation, which probably cannot be established as motivation, that management was trying to effectively freeze out a minority interest. Compare Gerlach v. Gillam, 37 Del.Ch. 244, 139 A.2d 591 (Ch.1958).

There does not appear to be in the record any effort on the part of management to slow or seek a delay in the December 21st deadline which was imposed by the December 18th offer of Burmah. Rather the circumstances are consistent with Signal's management approval of the forced decision on a tight time schedule. It is clear that Burmah's strategy was to force a quick decision. Roberts affidavit, docket number 20, paragraph 15.

The decision to call a special meeting of the Board on approximately two days' notice highlights the failure of management to advise the Board in their capacity as Board members of this very important transaction. Only six directors (Walkup, Shumway, Chitiea, Arms, Thompson and Stevenson) knew of the purpose of the meeting in advance. Walkup affidavit, docket number 34. Not only was the call short but management failed to give any notice of the subject matter in advance. The question is not one of legality. The question is one of permitting the Board the

---

9. As early as October 24th, Burmah had indicated a price in the range of 400 million dollars, and was advised such an offer would be taken to the Board of Directors. Thompson deposition, docket number 24, p. 48. Shumway indicated the terms would be satisfactory in October. Chitiea deposition, docket number 28, p. 25.

opportunity to make a reasonable and reasoned decision.

 There is no question that the energy crisis has created a drastic change in the value of oil and gas properties. Even granting that there may be wide divergence in expert viewpoint, the situation made desirable an updated evaluation since the Hill evaluation as of September 30 and the De Golyer and MacNaughton evaluation as of June 30.[10] Indeed, the defendants' own expert in this proceeding, while he values Signal Oil at less than the sale price, also values Signal Oil at $60,000,000 more on December 21 than he did on September 30. Moreover, questions on fairness were naturally directed to Thompson, a director who will continue with Signal Oil after the sale to Burmah.

In addition, even though the directors knew of Signal's need for cash, there had been no precise analysis about the use of the money to be obtained from the sale. Indeed, the income projections which were presented at the director's meeting showed that income will decrease in the three years after the sale as compared with the projections prior to the sale. Even making allowance for the fact that Signal Oil has evidently failed to achieve projections, this presentation is somewhat out of the ordinary. See Exhibit 5 to docket number 21; Chitiea deposition, docket number 28, p. 121.

The factors, which suggest imprudence and perhaps some others such as the differences that Signal Oil personnel had with the De Goyler and MacNaughton report and certain potential liabilities of Signal which survive the sale, do not in my judgment raise at this stage a reasonable probability that the plaintiff will be able to pierce the "business judgment" standard. When considered in light of the whole case, they do not in themselves justify the conclusion that the "directors acted so far

without information that they can be said to have passed an unintelligent and unadvised judgment." Mitchell v. Highland-Western Glass Co., *supra,* 19 Del.Ch. at 329–330, 167 A. at 833. But, and perhaps particularly on this preliminary application, the full circumstances surrounding the approval do relate to the overriding factual issue in the case. What was Signal Oil worth on December 21, 1973? Or to put the question in its legal context, did the Signal directors act without the bounds of reason and recklessly in approving the price offer of Burmah?

 Thus, the ultimate question is not one of method but one of value. The method does not appear so bad on its face as to alter the normal legal principles which control. But hasty method which produces a dollar result which appears perhaps to be shocking is significant. On the basis of affidavits relating to value, the Court has the tentative belief that plaintiff would have a reasonable prospect of success on the merits since limited record indicates a gross disparity between the fair market value of Signal Oil on December 21, 1973 and what the Board of Directors were willing to sell the company for, namely, $480,000,000. To the extent the scale tips, on the present record, the nod is to the plaintiff. But I hasten to add that an extremely high security consistent with the figures being discussed, should be required.

The affidavits dealing with the value of Signal Oil as of December 21, 1973 have been submitted to the Court. They are in marked conflict on almost every important matter. Naturally, what most concerns the Court is the enormous discrepancy in expert estimates on the total value of Signal Oil. But, the tremendous difference that a slight variation of single factor makes in the ultimate value is also crucial. In effect, an unreasonable valuation of one factor could alter the ultimate result.

---

10. Contrary to the suggestion of the plaintiff, competitive bids are not required. Abelow v.

Midstates Oil Corp., 41 Del.Ch. 145, 151, 189 A.2d 675, 678 (Supr.Ct.1963).

Signal's primary expert, Kenneth E. Hill, who valued the fair market value of Signal Oil's oil and gas properties in September, 1973, at $350,000,000, now concludes that their worth had reached $410,000,000 by December 21, 1973. (¶ 8 of Hill Aff.) [11] He further values Signal Oil's other assets at approximately $28,000,000 and concludes (at ¶ 20 of his affidavit):

"Accordingly, I value Signal Oil in its entirety as a company at $438,000,000, as compared to the purchase price of $480,000,000 plus the North Sea retained interest which Signal Oil's parent corporation is to receive from the sale of the Signal Oil stock to Burmah."

On the other hand, Paul V. Keyser, Jr., one of plaintiff's experts, concludes that Signal Oil's oil reserves alone can be conservatively valued at $791,875,000 (¶ 12 of Keyser's January 3, 1974 aff.); that its total gas reserves are worth another $124,980,000 (¶13); and that its other properties are worth $98,000,000 (¶ 14).[12] Mr. Keyser discounts the total of these values ($1,014,855,000) by a substantial discount factor of 25% to produce his final fair market value estimate of $761,000,000 (¶ 15), a figure almost twice Mr. Hill's estimate and $281,000,000 more than the sale price agreed upon by defendants.

There is general consensus as to what factors should be considered; namely, the price of oil, the amount of oil and gas reserves (which could increase if the future price of oil makes development economically feasible), production costs, capital outlay, taxes, discount and risk factors, etc. But there is considerable conflict between the two sides as to their estimates of what future weight each factor deserves in their calculations.

For example, with regard to price, Mr. Hill used an average price over a future 19 year period of $6.68 per barrel in reaching his December 21, 1973 valuation. (Hill Aff. Ex. C). [This was $1.54 more per barrel than he had used in marking his September, 1973 appraisal (Hill Aff. Ex. B).] Mr. Keyser, on the other hand, used an average price of $8.00 per barrel over a future 20 year period (Keyser Aff. ¶¶7, 8). Similarly, Mr. Hill used an average production cost figure of $1.80 per barrel in his September and December valuations. (Hill Aff. Exs. B & C). Mr. Keyser used an average production cost figure of $1.50 in his calculations. (Keyser Jan. 8, 1974 Aff. ¶6). Among other variables, the experts also disagree on capital expenditures, discount factors, and, especially, various tax ramifications.

As noted above, while a differential of a few cents or barrels in one factor or another may, at first blush, seem insignificant, such is not the case at all. Forrest A. Garb, another of plaintiff's experts, illustrates the disparity which results. See Garb affidavit of January 8, 1974, docket number 60. He submits a tabulation which "merely recomputes the value of Signal's domestic oil reserves using the same projections as Mr. Hill except for substitution of more realistic oil prices." Then he says:

"This one change results in increasing Mr. Hill's evaluation by $116,660,000. Use of a 10% discount factor, rather than the 12% discount factor employed by Mr. Hill increases the valuation by an additional $29,190,000. Elimination of Mr. Hill's provision for income taxes, to reflect Burmah's expectation, would result in further increases of $210,500,000 or $194,560,000, depending upon whether a 10% or 12% discount rate is used. The use of the De Golyer and MacNaughton expense projections, rather than those assumed by Mr. Hill, would further increase the valuation by an amount approximately $100 million."

11. The Hill affidavit is docket number 48.

12. The January 3, 1974 Keyser affidavit is docket number 15 and a later affidavit dated January 8, 1974 is docket number 59. The later is noted by date in references.

I note that Mr. Hill has been involved in evaluating Signal Oil in several capacities, that it is claimed he has been inconsistent in his conclusions and that he has not properly reflected market developments as of December 21, 1973. The weight against his opinion at this stage is slight indeed but slight weight can produce gross disparity.

This exemplifies the problem that so disturbs the Court. Although expert affidavits have been filed, there has been no oral testimony, no cross-examination, and no real opportunity for the Court to evaluate the basic figures and assumptions upon which these experts based their complicated analysis. In effect, the most important issue in the case had had the relative worst form of evidence.[13] Hence, even for preliminary injunction purposes, the Court is unable to properly judge the validity of the ultimate evaluations which conflict so greatly. The dollars involved are at such variance as to suggest that someone may be dead wrong.

Thus, the Court does not want to overemphasize the ultimate significance of its conclusion herein although the Court recognizes the temporary significance. Both sides have produced experts of high qualification and the question, especially in light of the business judgment rule, is extremely close. Certainly, the affidavits do not come near to exhausting the potential differences among the experts on this complex evaluation. Indeed, it is easy to speculate beyond the record that there are other experts who will support the conclusion voiced by affidavits in support of the directors' decision. In short, it is hard to imagine a final record after a full trial on the merits bearing much resemblance to the record on which I make the immediate

decision in the plaintiff's favor. The situation is not to my liking, but Chancellor Josiah O. Wolcott said in the Allied Chemical & Dye case, 14 Del.Ch. at 24–25, 120 A. at 496:

> ". . . As much as I am loath to issue the powerful process of injunction, yet where facts are presented which justify it, no personal reluctance of the Chancellor should restrain him. It is needless, of course, to say that the issuance of the preliminary injunction against the sale determines nothing finally. All that I am intending to now decide is that a case is presented which calls for fuller investigation; and that the subject-matter of the suit should remain in *statu quo* pending such investigation."

In essence, notwithstanding the affidavits and the conflict in their content, there remains a serious question about the reasonable probability that the plaintiff will succeed in this action. Therefore, notwithstanding my tentative conclusion on reasonable probability, I am convinced that the discrepancy between the values is so great that an immediate fuller investigation into this matter of fair value should be had. I have been mindful that, if the preliminary injunction is denied now, the plaintiff may well be barred of any significant relief upon proof which is not conclusive against him and which is of a character sufficiently strong to permit him at least to have the opportunity to sustain his contentions. To deny the injunction may well finally dispose of the case. Allied Chemical & Dye Corp. v. Steel & Tube Co., *supra*, 14 Del.Ch. at 24, 120 A. at 496.

But I am also mindful of the possible injuries that may be done to the Corporation and to those shareholders which support

---

13. I am not criticizing in this regard. The issue is complex and the affidavits themselves excellent in light of the time factor. But they are obviously not a basis for factual conclusions in this area. As for the suggestion in the Daum affidavit of January 8, 1974, docket number 58, that the defendants are to blame for the lack of live testimony, I note either side was free to make an application at the January 4, 1974 hearing. Indeed, perhaps a courtroom examination at that point was premature.

the Board action. I am particularly mindful that time may be of the essence in this situation where there are so many varying factors in such varying degrees. The longer the delay, the more likelihood the deal will be lost. It is not my intention, to the extent I can avoid, to allow a preliminary injunction to destroy the Corporation's opportunity for this transaction. Preliminary injunctions which allow the plaintiff all the relief he could hope to gain are rarely granted. Data General Corporation v. Digital Computer Controls, Inc., Del.Supr., 297 A.2d 437 (1972). The transaction, if its approval was within the legal power of the Signal Board, should be allowed to proceed. This means that the Court is going to have to impose difficult time standards on counsel and to narrowly limit the issues to be explored in the immediate future.

In particular, the Court will issue a preliminary injunction, to be effective upon posting of the required security, restraining the sale until February 15, 1974, unless the injunction is lifted or extended earlier by a subsequent order of the Court. If the preliminary injunction takes effect, pursuant to Rule 42, whether for further purposes of preliminary hearing or for purposes of final hearing I am not certain and would seek counsel's guidance, I will sever the issue of evaluation of Signal Oil and will set aside three trial days, January 23, January 24, and January 25 for trial solely on the issue of evaluation. If more time is needed for trial, it will be made available. Between now and January 21, counsel can take discovery as time permits. The names of all experts to be used must be disclosed not later than January 15.

One other significant factor remains which itself could be decisive. Under our Court Rules, Rule 65(c), Del.C.Ann., "[n]o . . . preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained." Frankly, counsel have been extremely unhelpful on the question of security, notwithstanding the fact that the Court specifically inquired at the hearing on January 4. The plaintiff suggested no security be required and the defendant Signal suggested security in excess of 200 million dollars. As noted, in this case, the security question is in itself a substantial one because it is not difficult to imagine that a security requirement of a high dollar value might be as effective in denying the plaintiff an opportunity to be heard as would the denial of a preliminary injunction. On the other hand, the difference between 480 million dollars plus and 438 million dollars, the value ascribed to Signal Oil by the Hill affidavit, is 42 million dollars plus, and the simple fact of the matter is Burmah seems to have an immediate out if they want to exercise it or if conditions, highly speculative, change Burmah's mind.

Judging the risk now in light of the short time interval now contemplated, Burmah's now apparent continuing desire to consummate the transaction, but bearing in mind the risk of losing the best offer that Signal has had as well as the potential loss to Burmah, and giving full weight to the language of the Rule, the Court fixes security in the amount of twenty five million dollars, an amount which is, as far as I have been able to determine, without precedent.

The plaintiff should present an order, on notice, tomorrow.