COURT OF CHANCERY
OF THE
STATE OF DELAWARE

JOHN W. NOBLE
VICE CHANCELLOR

417 SOUTH STATE STREET
DOVER, DELAWARE 19901
TELEPHONE: (302) 739-4397
FACSIMILE: (302) 739-6179

November 25, 2015

Martin S. Lessner, Esquire
Young Conaway Stargatt & Taylor, LLP
1000 North King Street
Wilmington, DE 19801

Bradley R. Aronstam, Esquire
Ross Aronstam & Moritz LLP
100 S. West Street, Suite 400
Wilmington, DE 19801

Douglas Herrmann, Esquire
Pepper Hamilton LLP
1313 North Market Street
Wilmington, DE 19801

Re: *Capital Link Fund I, LLC v. Capital Point Management, LP*
C.A. No. 11483-VCN
Date Submitted: November 9, 2015

Dear Counsel:

Plaintiffs in this action are Capital Link Fund I, LLC ("CLFI"), CT Horizon Legacy Fund, LP ("Connecticut Fund"), Capital Point Partners, LP ("CPP" or "the Partnership"), and Sema4 USA, Inc. (together, the "Plaintiffs"). Defendants in this action are Capital Point Management, LP ("CPMLP" or the "General Partner"), Capital Point Advisors, LP, Princeton Capital Corporation ("Princeton Capital"), Princeton Investment Advisors, LLC ("Princeton Advisors"), Princeton Advisory

Group, Inc., Alfred Jackson, Munish Sood, Gregory J. Cannella, Thomas Jones, Jr., Trennis L. Jones, and Martin Tuchman (together, the "Defendants").

Plaintiffs bring this action against Defendants for breach of the Capital Point Partners, L.P. Amended and Restated Limited Partnership Agreement (the "Partnership Agreement"), breach of the covenant of good faith and fair dealing; equitable rescission; breach of fiduciary duties; aiding and abetting breach of fiduciary duties; fraud; and civil conspiracy to commit fraud.

## I.    BACKGROUND

In August 2008, Plaintiffs and CPMLP entered into a partnership to "invest in [s]ecurities for long-term appreciation."[1]  CPMLP served as general partner of the Partnership, and CLFI and Connecticut Fund were among the limited partners.[2] The Partnership Agreement governs the relationship among the parties, and provides that "Seventy Percent in Interest of the Limited Partners may remove the General Partner and/or the Investment Manager at any time without cause."[3]

---

[1] Verified Compl. ("Compl." or the "Complaint") Ex. A ("P'ship Agmt.") § 1.8(a).
[2] Compl. ¶ 1.  A large majority of CPP's limited partners are public pension funds. *Id.* ¶ 30.
[3] P'ship Agmt. § 2.8(a).

Following removal of the General Partner, "Eighty Percent in Interest of the Limited Partners" may "designate a successor general partner within 90 days of the effective date of such removal."[4]

The Partnership Agreement requires consent of a majority-in-interest of limited partners "before the General Partner can cause the Partnership to commit a large percentage of its assets to one portfolio investment[] [or] hold a majority of the voting shares of a portfolio investment."[5] The Partnership Agreement also provides for a five-member board of advisors (the "Board of Advisors") consisting of representatives of the limited partners and "other persons unaffiliated with the General Partner."[6] The Board of Advisors has authority to "review and approve or disapprove [of] . . . the appropriateness of any action or inaction on the part of the Partnership in any situation that poses, or may pose, a conflict of interest involving the Partnership, the General Partner, the Investment Manager and their Affiliates."[7]

---

[4] *Id.* § 2.8(d); *accord* Compl. ¶ 38.
[5] Compl. ¶ 6; *accord* P'ship Agmt. § 1.8(c)(i), (vi).
[6] P'ship Agmt. §§ 2.3(b), 2.6; Compl. ¶ 35.
[7] P'ship Agmt. § 2.6(b).

Approval of the Board of Advisors does not, however, substitute for a majority vote of the limited partners where such vote is required.[8]

CPMLP sent to the Board of Advisors "summary materials" describing and seeking approval for a proposed transaction between CPP and a new affiliate of CPMLP.[9] The proposed transaction involved a sale of substantially all of CPP's assets in return for shares of the new affiliate, and would therefore require not only Board of Advisors approval, but also approval of a majority in interest of the limited partners.[10] Though CPMLP received Board of Advisors approval for the proposed transaction, the transaction never took place; instead, without notice to the Board of Advisors or approval of the limited partners, CPMLP, in July 2014, caused the Partnership to "sell all of its assets to Princeton Capital," a different CPMLP affiliate, in return for shares of Princeton Capital's publicly traded common stock (the "Transaction").[11] As part of the Transaction, Princeton Capital entered into an "Investment Advisor Agreement" with Princeton Advisors, another

---

[8] Compl. ¶ 35.
[9] *Id.* ¶ 42.
[10] *Id.* ¶ 43.
[11] *Id.* ¶¶ 44-46.

CPMLP affiliate, in which Princeton Capital pre-approved any related-party transactions.[12]   The Investment Advisor Agreement also provides for payment of fees to Princeton Advisors for managing the assets that Plaintiffs allege were improperly transferred to Princeton Capital.[13]   The Transaction resulted in an increase in Princeton Capital's assets from $1 million to over $50 million (the "Disputed Assets").[14]

At a special meeting on March 6, 2015, Jackson (CPMLP's Chairman and Managing Partner), Sood, Thomas Jones, Trennis Jones, and Tuchman were elected directors of Princeton Capital (collectively, the "Board").[15]   The Board hired Canella, CPMLP's Chief Financial Officer, as Princeton Capital's CFO, and Sood as Princeton Capital's Chief Executive Officer.[16]   Though the Transaction closed on March 13, 2015, the limited partners first learned of it on April 14 through a public news article.[17]   CPMLP directly disclosed the Transaction to the

---

[12] *Id.* ¶ 46.
[13] *Id.*
[14] *Id.* ¶ 47.
[15] *Id.* ¶ 48.
[16] *Id.* ¶ 50.
[17] *Id.* ¶ 51.

limited partners on May 14 in CPP's "Quarterly Portfolio Review," at which time the limited partners sought additional information.[18] In response to numerous requests, the limited partners received only general information until July 30, when Princeton Advisors circulated to the Board of Advisors an invitation to the 2015 Annual Meeting of Stockholders (the "Annual Meeting").[19] The Annual Meeting was postponed from August 11 to September 10,[20] and Plaintiffs filed the Complaint on the morning of September 9, 2015. During a teleconference on September 9, Defendants agreed to postpone the Annual Meeting,[21] and on October 26, the Court ruled on the parties proposed Status Quo Orders, allowing for the payment of $243,394 in asset management fees from Princeton Capital to

---

[18] *Id.* ¶¶ 52-53.

[19] *Id.* ¶¶ 53-54. The Complaint further alleges that Princeton Capital's certificate of incorporation requires that any nominations or issues to be considered at the Annual Meeting be proposed by July 23, and that therefore the July 30 notification date "ensured that no Limited Partner action could affect any item to be voted on at the Annual Meeting." *Id.* ¶ 55.

[20] *Id.* ¶ 56.

[21] Telephonic Hr'g on Pls.' Mot. for Status Quo Order and Rulings of the Ct. 4, 7-8 (Sept. 9, 2015) (TRANSCRIPT); Letter from Martin S. Lessner, Esquire Regarding Entry of a Scheduling Order and Status Quo Order 7 (Oct. 29, 2015) ("Lessner Letter").

Princeton Advisors for the third quarter of 2015, and $100,000 per quarter thereafter (the "Management Fees").[22]

## II. CONTENTIONS

Defendants seek implementation of a status quo order permitting Princeton Capital to disburse funds for two distinct purposes, neither of which the parties addressed during the October 26 teleconference: (1) for payment of "Administration Fees" from Princeton Capital to PCC Administrator, LLC ("PCC Administrator"), which is a wholly owned subsidiary of Princeton Advisors, and (2) for payment of legal fees to defend itself in this action.[23] Plaintiffs seek implementation of a status quo order preventing these additional disbursements, alleging that they unnecessarily reduce the value of the Disputed Assets.[24]

---

[22] Teleconference Regarding Competing Proposed Scheduling Orders 32 (Oct. 26, 2015) (TRANSCRIPT) ("Tr. of Oct. 26 Teleconference").

[23] Letter from Bradley R. Aronstam, Esquire Regarding Pls.' Mot. for a Status Quo Order and Enclosing Defs.' Proposed Status Quo Order 2-3 (Oct. 29, 2015) ("Aronstam Letter").

[24] Lessner Letter 4-6.

### III.     ANALYSIS

A. *Status Quo Orders Generally*

Courts generally implement status quo orders, as opposed to preliminary injunctions, to maintain stability during contests for corporate office pursuant to 8 *Del. C.* § 225.[25]   While the parties here contest control of assets as opposed to control of a company, the same rationales apply, namely, that an injunction removing and replacing incumbent directors would be "both drastic and impractical," and may result in "disruptive changes in corporate administration."[26] Though status quo orders are generally the more appropriate interim remedy in the context of a control challenge, the two are similar to the extent "that the purpose of a preliminary injunction is to preserve the status quo."[27]

---

[25] *See* Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery*, § 8.08[f] (2014).

[26] *Id.* (citing *Kumar v. Racing Corp. of Am., Inc.*, 1991 WL 67083, at *9 (Del. Ch. Apr. 26, 1991)).

[27] *R & R Capital LLC v. Merritt*, 2013 WL 1008593, at *8 n.74 (Del. Ch. Mar. 15, 2013), *aff'd*, 69 A.3d 371 (Del. 2013); *accord Pharmalytica Servs., LLC v. Agno Pharms., LLC*, 2008 WL 2721742, at 3 n.6 (Del. Ch. July 9, 2008) ("The appropriateness of entering a status quo order is based on considerations similar to those consulted in determining whether other forms of interlocutory injunctive relief are appropriate."); *Gimbel v. Signal Cos., Inc.*, 316 A.2d 599, 602 (Del. Ch.)

B. *Administration Fees*

The Management Fees are paid from Princeton Capital to Princeton Advisors as compensation for managing the Disputed Assets.[28] The Administration Fees, however, are quarterly reimbursements of "approximately $100,000" paid from Princeton Capital to PCC Administrator for "expenses incurred in connection with . . . financial reporting, compliance, investor relations, the preparation of public filings, and governance matters."[29] While such fees are not paid directly to portfolio companies, they are paid to PCC Administrator employees, other than Jackson (though including Canella), for the preparation of documents necessary to comply with the United States Securities and Exchange Commission's and the Internal Revenue Service's periodic reporting

---

("The preliminary injunction constitutes extraordinary relief generally employed to do no more than preserve the status quo pending the decision of the cause at the final hearing on proofs taken." (internal quotation marks omitted)), *aff'd*, 316 A.2d 619 (Del. 1974).

[28] Teleconference Regarding Competing Proposed Scheduling Orders 13 (Nov. 9, 2015) (TRANSCRIPT) ("Tr. of Nov. 9 Teleconference"); Tr. of Oct. 26 Teleconference 10-11.

[29] Aronstam Letter 2.

requirements.[30]  Therefore, such payments are necessary for the maintenance of the assets currently controlled by Princeton Capital.

Further, while Plaintiffs initially opposed any payment other than those "necessary to pay directly to the portfolio companies," including payments to employees of Princeton Capital or its affiliates,[31] they later indicated a willingness to allow payments to Princeton Capital employees "specifically for maintaining the assets."[32]  Therefore, because the Administration Fees are necessary to maintain the assets in Princeton Capital's control, the Court approves payment of quarterly Administration Fees to PCC Administrator of $100,000, subject to a "true-up at the end of the quarter in the event that the projected fees are [greater or] less than what was required."[33]

---

[30] Tr. of Nov. 9 Teleconference 14, 25.

[31] Tr. of Oct. 26 Teleconference 8-9.

[32] *Id.* at 15.

[33] Tr. of Nov. 9 Teleconference 15-16.  Plaintiffs also seek to prevent Princeton Capital from paying its independent director fees, arguing that such directors have not performed any compensable actions. *Id.* at 11.  While Defendants do not dispute this specific contention, they argue, and the Court agrees, that it is inappropriate at this stage to implement a blanket restriction preventing all payment to independent directors (especially where such directors should further Plaintiffs' interests by ensuring proper management of the Disputed Assets). *Id.*

C. *Legal Fees*

Defendants seek to use Princeton Capital assets to defend themselves in this action.[34] They argue that Princeton Capital is entitled to defend itself with its own assets and that Jackson and Canella are entitled to advancement and indemnification pursuant to Princeton Capital's bylaws.[35] Plaintiffs cite *Technicorp International II, Inc. v. Johnston*[36] to support their position. The *Technicorp* court rejected the plaintiffs' argument that the company was a nominal defendant and the real parties in interest were the company's controllers, and that therefore the company's payment of the controllers' legal fees was improper.[37] The court held that "the corporation customarily pays the legal costs of opposing the § 220 or § 225 claim, even though the opposition often serves the interests (or

at 18. Defendants, therefore, may continue to make distributions to the independent directors from the Disputed Assets to the extent such fees reasonably accrue.

[34] Aronstam Letter 2.

[35] Tr. of Nov. 9 Teleconference 16-17.

[36] 2000 WL 713750 (Del. Ch. May 31, 2000).

[37] *Id.* at *43.

the position being taken) by the incumbent management,"[38] though it ultimately rejected the controllers' fee request on other grounds.[39]

This case, however, presents issues not considered in *Technicorp*. Most significantly, the corporation in *Technicorp* was a manufacturing company consisting of assets independent from the allegedly improper transactions.[40] Here, however, as Plaintiffs argue, the bylaws containing mandatory advancement and indemnification provisions govern a company that Defendants themselves created and capitalized solely by means of the disputed transaction.[41] In fact, Princeton Capital held only $1 million in assets before the contested Transaction.[42] The Court is unwilling to sanction Defendants' use of the Disputed Assets to pay its legal costs in defense of the transaction resulting in the dispute. The fact that the Disputed Assets are now controlled by an entity contractually obligated to indemnify Defendants does not change the outcome, especially where such assets

---

[38] *Id.*
[39] *Id.* at *43-44.
[40] *Id.* at *2.
[41] Tr. of Nov. 9 Teleconference 24.
[42] Compl. ¶ 47.

constitute substantially all of the entity's assets and Defendants seemingly used the entity solely to effectuate the disputed transaction.[43]

## IV.   CONCLUSION

For the reasons above, the Court approves Defendants' request to pay quarterly Administration Fees of $100,000 subject to an end-of-quarter adjustment and independent director fees, and rejects Defendants' request to pay their legal fees with the Disputed Assets.  Counsel are requested to confer regarding the form of an implementing status quo order.

Very truly yours,

*/s/ John W. Noble*

JWN/cap
cc:    Register in Chancery-K

---

[43]  *Id.* ¶ 50.